[No. C011756. Third Dist. Jan. 31, 1994.]

RUSSELL KUHN, Plaintiff and Appellant, v.
DEPARTMENT OF GENERAL SERVICES, Defendant and Respondent.

[No. C013437. Third Dist. Jan. 31, 1994.]

DEPARTMENT OF GENERAL SERVICES, Plaintiff and Appellant, v.
STATE PERSONNEL BOARD, Defendant;
RUSSELL KUHN, Real Party in Interest and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of footnote 11 of Discussion.

## COUNSEL

Daniel E. Lungren, Attorney General, Robert L. Mukai, Chief Assistant Attorney General, Henry G. Ullerich, Assistant Attorney General, Richard Thomson and Vincent J. Scally, Jr., Deputy Attorneys General, for Plaintiff and Appellant in C013437 and for Defendant and Respondent.

No appearance for Defendant.

Darrell S. Steinberg for Plaintiff and Appellant in C011756 and for Real Party in Interest and Appellant.

## OPINION

**DAVIS, J.**—Government Code section 19253.5 (undesignated section references will be to this code) authorizes an agency subject to civil service rules to determine if an employee is medically incapacitated for duty and then demote, transfer, or terminate the employee. Subdivision (h) accords the employee reinstatement rights upon rehabilitation, subject to "satisfactory completion of a new probationary period" if one is imposed.[2]

In the present appeal, the Department of General Services (DGS) "medically terminated" Russell Kuhn pursuant to this statute. Mr. Kuhn obtained reinstatement subject to a new probationary period. DGS later rejected him during the probationary period. The State Personnel Board (Board) determined it was bad faith on the part of DGS to reject Mr. Kuhn as an ordinary probationer (§ 19173) rather than as a "medical probationer" under section 19253.5, where he would have reinstatement rights. The Board revoked the rejection and awarded backpay. DGS filed a writ of administrative mandamus. (Code Civ. Proc., § 1094.5.) The trial court upheld the revocation of the probationary rejection, but vacated the award of backpay. The parties have cross-appealed from their respective disappointments.[3]

---

[2]In pertinent part, the subdivision provides, "Upon the request of an appointing authority or the petition of the employee who was terminated, demoted, or transferred in accordance with this section, the employee shall be reinstated to an appropriate vacant position in the same class[,] in a comparable class[,] or in a lower related class if it is determined by the [B]oard that the employee is no longer incapacitated for duty. . . . In approving or ordering such reinstatements, the [B]oard may require the satisfactory completion of a new probationary period. . . ."

[3]Before the completion of the administrative proceedings, Mr. Kuhn sought a writ of "traditional" mandamus (Code Civ. Proc., § 1085) to compel DGS to reinstate him with backpay. The denial of the writ was the subject of a related appeal (*Kuhn* v. *Department of*

We conclude that when an employee is reinstated from medical termination subject to a new probationary period, an agency is not limited to another medical termination—it may reject the employee for any of the reasons specified in the ordinary probation statute (§ 19173). The agency's choice between these two lawful alternatives cannot constitute "bad faith" permitting the Board to revoke the rejection (§ 19175) absent evidence the agency made the choice with the intention of illegitimately thwarting the employee's reinstatement rights. As there is no such evidence in the case before us, there is no evidence supporting the Board's revocation. We consequently shall reverse with directions to issue the writ prayed for by DGS. This resolution moots Mr. Kuhn's cross-appeal, which we shall dismiss.

## Standard of Review

■ "[U]nder our statutory scheme for employee discipline the appointing power is vested with the initial authority to determine and impose appropriate discipline. The Board in turn is vested with the authority to review the appointing power's action. But . . . the Board's reviewing authority is not limited to that equivalent to appellate judicial review. The Board is entitled to weigh the evidence and determine the facts and to exercise discretion in determining the sufficiency of the charges. . . . [¶] . . . There are . . . three bases for modification or revocation of the appointing power's imposition of discipline: (1) the evidence does not establish the fact of the alleged cause for discipline; (2) the employee was justified; or (3) the cause for discipline is proven but is insufficient to support the level of punitive action taken. Unless one of these [bases] is present the appointing power's action must stand." (*Department of Parks & Recreation* v. *State Personnel Bd.* (1991) 233 Cal.App.3d 813, 827 [284 Cal.Rptr. 839].)

■ In reviewing a decision of the Board on a petition for administrative mandamus, we stand in the same shoes as the trial court, applying the substantial evidence rule. (*Pan* v. *State Personnel Bd.* (1986) 180 Cal.App.3d 351, 357 [225 Cal.Rptr. 682].) "[I]n the absence of any substantial evidence [to support] its findings, the Board has no discretion to modify or revoke the discipline imposed by the appointing power." (*Department of Parks & Recreation* v. *State Personnel Bd., supra,* 233 Cal.App.3d at p. 831.)

■ There are two aspects to a review of the legal sufficiency of the evidence. First, one must resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable*

*General Services* (No. C011756)) consolidated with this case for oral argument. We have dismissed that appeal this day as moot in light of the result we reach here.

inferences.[4] (*Estate of Bristol* (1943) 23 Cal.2d 221, 223 [143 P.2d 689].) Second, one must determine whether the evidence thus marshaled is substantial. While it is commonly stated that our "power" begins and ends with a determination that there is substantial evidence (*Bristol, supra,* 23 Cal.2d at p. 223),[5] this does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment. The Court of Appeal "was not created . . . merely to echo the determinations of the trial court. A decision supported by a mere scintilla of evidence need not be affirmed on review." (*Bowman* v. *Board of Pension Commissioners* (1984) 155 Cal.App.3d 937, 944 [202 Cal.Rptr. 505].) "[I]f the word 'substantial' [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable . . . , credible, and of solid value . . . ." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].) The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 577-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) While substantial evidence may consist of inferences, such inferences must be "a product of logic and reason" and "must rest on the evidence" (*Louis & Diederich, Inc.* v. *Cambridge European Imports, Inc.* (1987) 189 Cal.App.3d 1574, 1584 [234 Cal.Rptr. 889]); inferences that are the result of mere speculation or conjecture cannot support a finding (*id.* at p. 1585; *Marshall* v. *Parkes* (1960) 181 Cal.App.2d 650, 655 [5 Cal.Rptr. 657]).

## FACTS

The pertinent facts in the case before us are not in dispute. They are gleaned from the 1990 administrative hearings, the exhibits admitted at these hearings, and the several Board decisions in the record.

DGS first hired Mr. Kuhn in February 1982, and he became a bookbinder I in July 1984. In the spring of 1987, his psychiatrist determined that the mental illness from which the then-40-year-old had suffered since his early 20's was a bipolar affective disorder (i.e., he was a "manic-depressive"), and he began taking lithium carbonate. However, by November 1987 Mr. Kuhn was making threats of violence against his supervisor; after a medical evaluation that concluded he was unfit for any position in the agency, DGS

---

[4]"Reasonable" inferences do not include those which are contrary to uncontradicted evidence of such a nature that reasonable people would not doubt it. (*Gaffney* v. *Downey Savings & Loan Assn.* (1988) 200 Cal.App.3d 1154, 1168 [246 Cal.Rptr. 421].)

[5]In point of fact, this limited review of facts is a matter of self-imposed policy, not a jurisdictional limitation. (9 Witkin, Cal. Procedure (3d ed. 1985), Appeal, § 279, p. 291.)

medically terminated him. (§ 19253.5, subd. (d).) Mr. Kuhn appealed the medical termination to the Board. (§ 19253.5, subd. (f).) He later petitioned for reinstatement in March 1988.

While both of these matters were pending before the Board, DGS referred Mr. Kuhn to Dr. Kaldor, a psychiatrist. After examining Mr. Kuhn and performing an on-site consultation with Mr. Kuhn's supervisors (whom the psychiatrist found to be nonjudgmental and cooperative), Dr. Kaldor concluded Mr. Kuhn was in a stable remission from his illness and was fit to return to duty subject to certain conditions. Subsequently, Mr. Kuhn and DGS came to an agreement under which he was reinstated effective October 1988, subject to those conditions. This agreement reserved for Board resolution two issues: the validity of the medical termination, and the condition of his reinstatement that required him to serve a new probationary period.

In its November 1988 decision, the Board upheld the validity of the medical termination, and also concluded, "The reinstatement statute does provide authority for the Board to reinstate an employee from medical termination subject to a new probationary period. In this instance the requirement is reasonable. [Mr. Kuhn]'s reinstatement effective October 26, 1988, should be subject to a new probationary period."

During the period following his reinstatement, Mr. Kuhn had difficulty satisfying the requirements of his position and was excessively absent. It is undisputed that his shortcomings were a function of either his psychiatric disorder, his problems adjusting to the dosage of lithium, or voluntary hospitalizations at psychiatric facilities.

After a January 1989 hospitalization, his treating psychiatrist (Dr. Pleasant) released Mr. Kuhn for return to work. DGS again referred Mr. Kuhn to Dr. Kaldor in early February 1989. Dr. Kaldor stated there was "a gradual deterioration in the ability of Mr. Kuhn to maintain a level of behavioral stability." The psychiatrist noted Mr. Kuhn was developing "an increasingly persecutory and litigious attitude regarding his employer." Projecting his anger and fears on those around him, Mr. Kuhn created "an untenable situation at work. This is not a case of failure by his employer to accommodate or respond to Mr. Kuhn's needs but rather it is Mr. Kuhn's mood instability based on the natural history of his Bipolar Mood Disorder which interferes with his ability to relate to those around him." Therefore, in Dr. Kaldor's opinion, Mr. Kuhn was unfit for work as a bookbinder or in any other position at DGS. After that examination, Mr. Kuhn disappeared, then admitted himself for another hospitalization lasting three weeks. Informed of these events by phone, Dr. Kaldor stated in a March 1989 follow-up

evaluation that "based on the social and occupational impairments which result from his chronic mental disorder, [Mr. Kuhn] is presently unable to maintain consistent work behavior in any occupation." Mr. Kuhn did not return to work as a bookbinder after the February 1989 hospitalization, electing instead to receive nonindustrial disability insurance benefits. By the time these benefits expired in August 1989, he assumed he had been terminated from his position and did not contact DGS.

In October 1989, DGS sent Mr. Kuhn a letter of rejection during probation. As the reasons for the action, DGS cited his "difficulty working with numbers, counting, sequencing and sorting mail . . . . keeping pace with production equipment . . . [and] doing sloppy work"; his below-standard interpersonal skills, which included "overreact[ion] to small errors made by co-workers" and "exhibit[ion of] inappropriate comments and responses to co-workers"; and his excessive absenteeism, which in the full months after his October 1988 reinstatement meant he worked only "61.5 hours in November 1988; 141.75 hours in December 1988[;] and 20.5 hours in January 1989." As noted by the Board, these strictly related to his ability to perform the work assigned him without any reference to his psychiatric ailment. He appealed to the Board.

Testifying at the February and May 1990 hearings were Dr. Karen Jacques, a psychiatrist who had been treating Mr. Kuhn since 1985; Robert Burke, the printing plant superintendent; Mr. Kuhn; and Susan Steiger, the DGS health and safety manager. In light of our ultimate resolution of this matter, we need not recount Dr. Jacques's opinion with respect to Mr. Kuhn's ability to return to work in a position other than bookbinder, offered both in the form of testimony and a declaration. All that is significant is her concession (echoed by Mr. Kuhn's counsel in his opening statement) that he was not capable of returning to work as a bookbinder and had been incapable at the time of his probationary rejection of performing those duties. Mr. Kuhn also testified he did not think he could work as a bookbinder; he wished reinstatement as a janitor. Mr. Burke testified that while he had no problem with Mr. Kuhn as an "overall employee," he did not think Mr. Kuhn could be successful in a production-related position; after Mr. Kuhn had returned from his January 1989 hospitalization, he had performed well in an ad hoc janitorial position that Mr. Burke and Ms. Steiger had fashioned for him as an accommodation to his condition pending his 1989 evaluation by Dr. Kaldor. However, this janitorial position did not reflect the duties of the official classification (which apparently is within the DGS's buildings and grounds division, not the printing plant), for which there are strict production requirements. After Ms. Steiger received the February 1989 report from Dr. Kaldor, she questioned him about Mr. Kuhn's suitability for the official

janitorial classification. He responded with the March 1989 evaluation in which he opined that Mr. Kuhn could not work at any classification. She therefore made no further efforts to seek an accommodation of Mr. Kuhn's condition.

In the hearing officer's proposed statement of decision, she found Mr. Kuhn had admitted that he was incapable of performing the duties of his class or any other position in DGS from the time he was evaluated in March 1989 through the date he was rejected from probation. However, the hearing officer felt a rejection from probation strictly on the basis of an inability to do the work without consideration of the psychiatric basis of the inability violated "the intent" of section 19253.5. The hearing officer therefore recommended that the rejection be modified to a medical termination. As Mr. Kuhn had asked for "reinstatement" from this "medical termination" and presented uncontroverted evidence he was capable of performing the duties of a lower class in DGS, the hearing officer granted the petition and ordered him reinstated to the position of janitor.

The Board rejected the proposed decision. In its own decision of January 1991, it agreed with the hearing officer that it was "inappropriate" for the DGS to process Mr. Kuhn as a rejection from probation rather than institute another medical termination. " 'It was inequitable for the respondent to . . . bar the appellant [permanently] from reinstatement by applying the criteria of a new probationary period . . . to an employee on medical probation [*sic*] and to reject the employee when the cause of his inability to perform was strictly medical in nature and a termination for medical reasons was appropriate. Clearly, such action also violated the intent of Section 19253.5(h), SPB Rule No. 446, and DPA Rule No. 599.826 to treat medical separations as temporary in nature and to preserve the right of the employee terminated for medical reasons to reinstatement when the employee is again capable of performing his duties.' [¶] *For the foregoing reasons, the Board concludes that the respondent acted in 'bad faith' within the meaning of Government Code section 19175(d) when it brought this action as a rejection on probation rather than a medical matter under Government Code Section 19253.5.*" (Italics supplied.) For reasons of due process, the Board concluded it had been improper for the hearing officer to have modified the rejection to a medical termination; therefore, the Board simply revoked the rejection without prejudice to a subsequent medical termination.

The Board scheduled proceedings in April 1991 on the issue of backpay due Mr. Kuhn. (§ 19180 [backpay where rejection revoked].) In May 1991, the Board adopted a proposed decision awarding backpay retroactive to

October 1989. It denied a petition for rehearing filed by DGS in September 1991.[6]

## DISCUSSION

Although we have cross-appeals, our discussion is focused only on the propriety of the action by DGS in October 1989 rejecting Mr. Kuhn from probation. If valid, he is not entitled to backpay. It is only if the rejection was *invalid* that we need concern ourselves with his cross-appeal.

According to section 19173, "Any probationer may be rejected by the appointing power during the probationary period for reasons relating to the probationer's qualifications, the good of the service, or failure to demonstrate merit, efficiency, fitness, and moral responsibility . . . ." The Board's standard of review of a rejection is specifically prescribed in section 19175: "The [B]oard at the written request of a rejected probationer . . . may investigate with or without a hearing the reasons for rejection. After investigation, the [B]oard may . . . [r]estore him or her to the position from which he or she was rejected, but this shall be done only if the [B]oard determines, after hearing, that there is no substantial evidence to support the . . . reasons for rejection, or that the rejection was made in fraud or bad faith. At any such hearing the rejected probationer shall have the burden of proof; subject to rebuttal by him or her, it shall be presumed that the rejection was free from fraud and bad faith and that the statement of reasons therefor in the notice of rejection is true."

According to the Board decision we have recounted earlier, the Board purported to revoke the rejection on the ground it had been made "in bad faith." Curiously, we have found no decision giving content to this phrase in the specific context of section 19175 (nor does there appear to be any pertinent regulation). However, we agree with the suggestion by DGS that there is no reasoned basis for giving "bad faith" here a definition different from that developed in the general employment context. ■ Viewing the terms and conditions of employment as creating a species of contract between employer and employee, there is implied in this relationship (as in all contracts) a covenant of good faith and fair dealing; the obligation imposed by this covenant is measured by the provisions of the particular agreement at issue. (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 683-684 [254 Cal.Rptr. 211, 765 P.2d 373].) In essence, it is an implied

---

[6]In the trial court, Mr. Kuhn requested judicial notice of a stipulation (filed in his related appeal) that he had been reinstated by DGS to the position of automotive pool attendant I effective July 1, 1991.

promise that neither party will take any action extraneous to the defined relationship between them that would frustrate the other from enjoying benefits under the agreement to which the other is entitled. (*Koehrer* v. *Superior Court* (1986) 181 Cal.App.3d 1155, 1170 [226 Cal.Rptr. 820]; *Khanna* v. *Microdata Corp.* (1985) 170 Cal.App.3d 250, 262 [215 Cal.Rptr. 860] [both disapproved in *Foley, supra*, 47 Cal.3d at p. 700, fn. 42, to the extent they suggest the availability of tort remedies for breach of this covenant].) Thus, under its obligation to act in good faith DGS could not take any action with the intention that the procedural or substantive entitlements of its probationary employees be illegitimately thwarted.

■ In the present case, the Board identified the apparent "benefit" of which Mr. Kuhn was improperly deprived as the medical termination procedure of section 19253.5 with its right of reinstatement. As we shall demonstrate, DGS was under no obligation to proceed only under section 19253.5 in separating Mr. Kuhn from its employ, so its election to proceed as a rejection under section 19173 cannot by itself constitute bad faith. Moreover, there is absolutely no evidence that the election by DGS was the result of an improper motive to "deprive" him of section 19253.5 reinstatement rights.

First of all, although in the decision under review the Board referred to Mr. Kuhn's status as being on "medical probation," this is not a term reflected in either the medical termination statute (§ 19253.5, subd. (h)) or anywhere in the article governing probationary periods (§ 19170 et seq.). ■ Thus, the Board has no authority to fashion this hybrid civil service classification ipse dixit, even as a matter of administrative interpretation of its governing statutes, for it is not permitted in the guise of "interpretation" to enlarge the scope of the statutes. (*Henning* v. *Division of Occupational Saf. & Health* (1990) 219 Cal.App.3d 747, 757-758 [268 Cal.Rptr. 476].) ■ Section 19253.5, subdivision (h) specifies only that "a new probationary period" is an available option when the Board orders the reinstatement of a medically terminated employee. It would seem clear that the Legislature's use of the adjective "new" would mean a probationary period akin to that originally served by the medically terminated employee, i.e., probation pursuant to section 19170 et seq.

This brings us to the Board's interpretation of the interplay of section 19253.5 and the general provisions regarding probation, under which it concluded a reinstated probationer's medically related inability to satisfy job requirements *must* be processed as a medical termination (with right of reinstatement) rather than a run-of-the-mill failure on probation. As noted above, the Board cited three sources of "intent" on which it relied to come to

this conclusion: section 19253.5 and identical regulations promulgated by the Board and the Department of Personnel Administration (Cal. Code Regs., tit. 2, §§ 446, 599.826).[7]

 We divine no such intent in 19253.5, and in the interpretation of a governing statute we apply a "respectful but nondeferential standard of review" to the Board's interpretation. (*Henning* v. *Division of Occupational Saf. & Health, supra,* 219 Cal.App.3d at p. 758.) To say that a reinstated probationer must be given a right of reinstatement each time the probationer is medically incapacitated would render the provision authorizing the imposition of a new probationary period (with no reinstatement rights) a superfluous nullity adding nothing to the statute, which is not a permissible mode of interpretation. (*Grupe Development Co.* v. *Superior Court* (1993) 4 Cal.4th 911, 921 [16 Cal.Rptr.2d 226, 844 P.2d 545].) There could be no purpose in providing for a new probationary period other than to allow the appointing power to permanently separate the employee if it so chose. It would make no sense that a new probationary period was imposed for any qualifications of the terminated employee *other* than medical fitness for work, since none of these qualifications would have been called into question by a medical termination. If the appointing power wanted to maintain a revolving door for an employee with iterated medical incapacitations, there would be nothing preventing it from reinstating the employee *without* requesting a new probationary period. But for the appointing power desiring to manage its work force in a more efficient manner, the new probationary period provides a means for removing employees who, having been given a second chance (or a third, or a further iteration), have unfortunately demonstrated they are not medically capable of performing the required work. We find this interpretation of section 19253.5 to be supported by the contemplation in section 19175.1 of a situation in which an appointing power has rejected a probationer strictly for medical reasons.[8] Were there indeed some legislative intent to treat all medically based incapacities

---

[7]These identical definitional regulations both provide, "Temporary separations from state service shall include all types of leave of absence including [informal] leave . . . , military leave, suspension, termination for medical reasons, termination of permanent or probationary employee[s] by layoff, termination by displacement, and disability retirement. Permanent separations from state service shall include dismissal; resignation; automatic resignation (AWOL); rejection during probationary period; termination for failure to meet conditions of employment; termination of limited-term, temporary authorization, emergency, Career Executive Assignment, or exempt appointment[s]; and service retirement."

[8]The statute provides in pertinent part, "The [B]oard, upon the written request of a probationer who has been rejected *for medical reasons only,* may restore the name of the rejected probationer [etc.] . . . ." (Italics supplied.)

as temporary separations from the civil service, there would be no reason to provide for this situation.[9]

Reference to the regulations adds nothing to the analysis. The regulations being merely definitional of what constitutes temporary separations, it becomes tautological for the Board to conclude a rejection on probation caused by a medical incapacity must be treated as a temporary separation because *medical terminations* are defined as temporary separations, since this begs the question of whether the rejection *should be* treated as a medical termination. Moreover, as we have stated above, these agency determinations of legislative policy are not binding on a court.

In short, then, DGS did not take an impermissible action in merely rejecting Mr. Kuhn on probation rather than using the procedures of section 19253.5 again. Both were legitimate options available to the agency.

■ Conceivably, bad faith might be demonstrated even where an employer has a range of permissible actions if the choice were driven by animus against the employee's enjoyment of a benefit. In the present context, Mr. Kuhn would have the burden (since the rejection is presumed to be free from fraud or bad faith (§ 19175, subd. (d); *Anderson* v. *State Personnel Bd.* (1980) 103 Cal.App.3d 242, 249 [162 Cal.Rptr. 865]) of producing evidence that DGS chose rejection over medical termination for no reason other than to deprive him of the benefit of a reinstatement right. However, in the entirety of the record we have reviewed and recounted, there is not a scintilla of evidence from which even an inference of the necessary animus might be found, nor does the Board decision even attempt to suggest any. Indeed, the uncontroverted evidence at the administrative hearings shows that Mr. Kuhn's supervisors were cooperative with his psychiatrists in attempting to accommodate Mr. Kuhn's condition until they were informed he was simply incapable of performing any job duties at all. There is absolutely no evidence to support bad faith in this regard.

■ Since DGS did not take an impermissible action depriving Mr. Kuhn of his statutory protections, and there is no evidence otherwise demonstrating its choice of options was in bad faith, there is no evidence supporting the Board's findings. Consequently, the Board had no discretion

---

[9]Mr. Kuhn asserts that section 19175.1 is immaterial because DGS did not reject Mr. Kuhn on probation for medical reasons. That is not the point. The significance of the statute lies in the fact that the Legislature contemplated that there *can* be probationary employees rejected solely on a medical basis, thus obviously implying that not all medically impaired probationers must be given reinstatement rights pursuant to section 19253.5.

to revoke the action by DGS.[10] We therefore will reverse the judgment to the extent it denies relief to DGS. As this moots Mr. Kuhn's cross-appeal, we shall dismiss it.[11] (9 Witkin, Cal. Procedure, *supra*, Appeal, § 521, p. 503.)

## DISPOSITION

The judgment is reversed in part with directions to grant the petition of DGS for a writ annulling the Board's reinstatement order. The cross-appeal by Mr. Kuhn is dismissed as moot. DGS shall recover costs of appeal.

Sims, Acting P. J., and Raye, J., concurred.

---

[10]Since we have determined that there was no evidence to support the Board's findings, we need not consider Mr. Kuhn's argument that review of a probation rejection should have been by traditional mandamus rather than administrative mandamus because no hearing was required by law; as we have stated in a similar context, where the result is affected not a jot by the distinction between the two standards of review, ". . . the argument leads nowhere." (*Swift* v. *County of Placer* (1984) 153 Cal.App.3d 209, 213, fn. 4 [200 Cal.Rptr. 181].)

[11] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*

---

*See footnote 1, *ante*, page 1627.