Filed 10/30/14  Lostaunau v. Rolling Frito-Lay Sales CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ADOLPH LOSTAUNAU et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> ROLLING FRITO-LAY SALES, LP, <br><br> Defendant and Respondent. | F064174 <br><br> (Super. Ct. No. VCU232409) |
| ADOLPH LOSTAUNAU et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> ROLLING FRITO-LAY SALES, LP, <br><br> Defendant and Appellant. | **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING** <br><br> **[NO CHANGE IN JUDGMENT]** <br><br> F065459 <br><br> (Super. Ct. No. VCU232409) <br><br> Tulare County |

**THE COURT:**

It is ordered that the opinion filed herein on October 6, 2014, be modified in the following particulars:

1.  On page 16, the first five sentences in the first full paragraph, beginning with "Likewise, we see no reason to disturb" and ending with "not reasonably certain to occur in the future" are deleted and the following sentences are inserted in its place:

> Likewise, we see no reason to disturb the jury's $0 award for Adolph's future pain and suffering.  Substantial evidence indicated that Adolph's condition could be resolved within one month by an alternative course of treatment consisting of various therapies and anti-neuropathic medications such as Pregabalin and Gabapentin, which lack the side effects of opiate pain relievers but were not prescribed.  Ruffalo opined that this new regimen would not only remedy Adolph's physical pain, but also improve his mindset, which Zehler highlighted as a key contributor to amplified symptoms.  Moreover, Adolph would no longer be subjected to a seemingly endless cycle of rhizotomies.  Substantial evidence also indicated that Adolph would not experience any pain and suffering during the transition from the old regimen to the new one. The record shows that Adolph normally experienced inflammation and discomfort for six weeks and then no functional pain for at least three months following each rhizotomy.  Adolph's latest rhizotomy was performed on February 15, 2011.  The jury rendered its verdict in this case on April 18, 2011, roughly two months later.  Hence, at the time of the verdict, Adolph was already into the first month of this three-month relief period and had at least two months to switch to the new regimen. The jury, therefore, could find that Adolph's pain and suffering were not reasonably certain to occur in the future.

There is no change in judgment.  Defendant's petition for rehearing is denied.

_____
DETJEN, J.

WE CONCUR:


_____
 HILL, P.J.


_____
 LEVY, J.

2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ADOLPH LOSTAUNAU et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> ROLLING FRITO-LAY SALES, LP, <br><br> Defendant and Respondent. | F064174 <br><br> (Super. Ct. No. VCU232409) <br><br><br> **OPINION** |
| ADOLPH LOSTAUNAU et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> ROLLING FRITO-LAY SALES, LP, <br><br> Defendant and Appellant. | F065459 <br><br> (Super. Ct. No. VCU232409) <br><br> Tulare County |

APPEAL from a judgment of the Superior Court of Tulare County.  Patrick J. O'Hara (Retired Judge of the Tulare Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) and Paul A. Vortmann, Judges.[*]

Greene, Broillet & Wheeler, Bruce A. Broillett, Scott H. Carr and Alan Van Gelder; Esner, Chang & Boyer, Stuart B. Esner and Andrew N. Chang for Plaintiffs and Appellants and for Plaintiffs and Respondents.

Manning & Kass, Ellrod, Ramirez, Trester, Louis W. Pappas and Steven J. Renick for Defendant and Respondent and for Defendant and Appellant.

-ooOoo-

This is a consolidated appeal from a judgment and postjudgment order of the Superior Court of Tulare County.  Plaintiff Adolph Lostaunau pled a cause of action for negligence against defendant Rolling Frito-Lay Sales, LP (Frito-Lay).  Plaintiff Vivian Lostaunau,[1] Adolph's wife, sued for loss of consortium.  At trial, Frito-Lay conceded that its employee Sandy Nardone was negligent and that her negligence caused harm to Adolph.  By special verdict, the jury awarded Adolph $90,896 for past lost earnings, $340,000 for past medical expenses,[2] $75,000 for past pain and suffering, $21,872 for future lost earnings, $40,064 for future medical expenses, and $0 for future pain and

---

[*]     Judge O'Hara presided over the jury trial and ruled in the motion for a new trial; Judge Vortmann ruled in the postjudgment motion to tax costs.

[1]     We subsequently identify plaintiffs by their first names, even though Vivian is often identified by her middle name Marlene in the appellate record.  No disrespect is intended.

[2]     This amount was subsequently reduced to $157,931.  (See *Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541 [a plaintiff may not recover the difference between the amount stated in a medical provider's bill for medical care and services rendered and the discounted amount the provider agreed to accept from the plaintiff's private insurer as full payment].)

2.

suffering.[3] The jury also found that Vivian was not entitled to damages "for loss of her husband's love, companionship, comfort, care, assistance, protection, affection, society, moral support, and enjoyment of sexual relations." The court denied Adolph and Vivian's motion for a new trial on the issue of damages. Following entry of judgment, Frito-Lay filed a memorandum of costs against Vivian in the amount of $62,300.16. Vivian filed a motion to tax these claimed costs in their entirety. The court issued an order granting Vivian's request.

On appeal, Adolph challenges the adequacy of the jury's determination of his past and future noneconomic damages and Vivian challenges the jury's determination of her loss of consortium damages.[4] Frito-Lay challenges the superior court's postjudgment order granting Vivian's motion to tax costs. We conclude that substantial evidence supported the jury's awards for Adolph's pain and suffering, but did not support its finding that Vivian was not entitled to damages for loss of consortium. We reverse the judgment as to Vivian's claim, and remand the matter for a new trial limited to the calculation of damages for loss of consortium. (*Mealy v. B-Mobile, Inc.* (2011) 195 Cal.App.4th 1218, 1225, 1227 (*Mealy*).) Because we find Vivian was entitled to compensation, Frito-Lay's appeal is moot. We therefore reverse the superior court's order granting Vivian's motion to tax the costs sought, postjudgment, by Frito-Lay. (*Paul v. Milk Depots, Inc.* (1964) 62 Cal.2d 129, 134-135; *Giles v. Horn* (2002) 100 Cal.App.4th 206, 229; *County of Fresno v. Shelton* (1998) 66 Cal.App.4th 996, 1005.)

---

**3** In addition, the jury pronounced that Adolph's own negligence was a substantial causal factor and attributed 10 percent of the fault to him, reducing the gross award from $385,763 to $347,186.70.

**4** In their brief, Adolph and Vivian raise another argument in a footnote. We decline to address this argument because it is not listed under a separate heading or subheading as required by California Rules of Court, rule 8.204(a)(1)(B). (*Silverado Modjeska Recreation & Park Dist. v. County of Orange* (2011) 197 Cal.App.4th 282, 314, fn. 24; *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 542.)

## FACTUAL HISTORY

On April 30, 2007, at the Save Mart Supermarket in Porterville, California, Nardone was in the process of delivering product when Adolph, a Surtec service technician, arrived to fix the store's floor buffer. Adolph brought the appliance outside to his vehicle, where he kept tools and spare parts and which was parked "some distance" from Nardone's Frito-Lay truck. Adolph sat on a milk crate, faced away from the Frito-Lay truck, and performed repairs on the appliance. While Nardone was attempting to load two 137-pound carts into the truck, one of the carts rolled off the lift gate and struck Adolph from behind.[5] Adolph sustained a visible head wound.[6] Adolph was initially attended by several Save Mart employees, but subsequently drove himself to Sierra View District Hospital, where he was examined by the emergency physician, underwent X-rays and a computed tomography (CT) scan, and was prescribed Vicodin,[7] ibuprofen, and a muscle relaxant. He did not require stitches and was discharged later that evening.

The next day, on May 1, 2007, Adolph experienced head, neck, and left shoulder pain. He worked intermittently for a few weeks and reported pain, discomfort, headaches, blurred vision, poor concentration, memory lapses, and panic attacks. Adolph's employee logs, which had been "very thorough" prior to the accident, were terse and filled with errors. At home, he was unable to accomplish tasks or perform

---

**5** The record presents conflicting accounts on what transpired immediately after the collision. Adolph testified he was temporarily unconscious and later found himself on the ground. He then heard Nardone scream, "I killed him." Nardone corroborated Adolph was "flat on his back." By contrast, Kevin Pope, the store manager, testified he witnessed the accident, was the first person to attend Adolph, and saw Adolph, who was neither unconscious nor "sprawled out on the ground," "sitting upright" on the milk crate and "propp[ing] up" the cart with his back.

**6** Pope testified that Adolph "had a scratch on his head," which "was red on the surface" but did not bleed. Nardone, on the other hand, specified that "there was blood on [Adolph's] head."

**7** This drug is alternatively identified as Norco in the record.

sexually.  In July and August 2007, Adolph was assessed by various physicians and underwent physical therapy.  He was eventually referred to the Centre for Neuro Skills (CNS) in Bakersfield, California, where he engaged in weekly psychotherapy and occupational rehabilitation sessions for the period of August 27, 2007, to April 9, 2009.  At some point in 2009, Adolph was prescribed the antidepressant Zoloft.

In May 2008, Adolph was referred to Dr. Sheldon Jordan, who is board certified in neurology, clinical neurophysiology, interventional pain procedures, pain medicine, and addiction medicine.  Adolph presented neck and shoulder pain, headaches, and bilateral hand numbness.  On July 9, 2008, Jordan administered a scalene block, the results of which were negative and consequently ruled out thoracic outlet syndrome.  On August 13, 2008, Jordan administered a facet block, the results of which were positive and confirmed that Adolph's pain emanated from the cervical facet joints.[8]  Thereafter, Jordan recommended a rhizotomy, a "radiofrequency procedure [that] … cauterize[s] … the little nerve endings that go to those [facet] joints."  He described the procedure:

> "[W]e take a 20-gauge needle ... and we come in through the behind, right next to where that nerve is[.]  … [W]hen we pass electrical current through it very rapidly,… the current is passed back and forth so rapidly that the electrons basically produce friction, so that heats up the tip of the needle[.] … [W]e're talking about 80 degrees [Celsius],… just below boiling, so [you can] imagine a hot stove, you put your hand on it, you look at it, and it's going to be burned….  It's that kind of a burn.  [¶]  So we burn the

---

[8]    Jordan detailed:

> "What's relevant are these joints in the back of the spine which are called the facet joints.  So you had the discs in front, in the neck here.  And you have the facet joints in the back on both sides.  [¶] … [¶]  These joints on the back side are designed for maintaining lateral stability so your head doesn't just flop over and it limits the amount of extension and flexion that you can have….  [¶] … [¶]  There are pain fibers in all of these structures and there are pain fibers that innervate these joints so if these joints are damaged, it hurts."

nerves that go into these facet joints at each level where the pain is produced. [¶] … [¶]

"… [T]he heat actually makes that nerve shrivel up. But … it can actually take several weeks and … sometimes more than a month. So it's not actually instantaneous. And that's important because the patient will go through a painful process because now you've stuck needles in and cauterized the tissues and it hurts and it takes several weeks for the good part to actually come into effect. [¶] … [¶] … [A]t the end of the procedure this nerve is still connected, but it's angry because you've just heated it up, and you've also heated up the tissues around it, so there's an inflammatory process which can be quite painful and that could last for many weeks. [¶] … [¶] … So it could take several weeks, maybe up to six weeks at the most for the pain relief to happen. And patients are usually pretty good for a certain number of months. [¶] We like to get 12 months out of these, but very often it's only six months. And at the end of the six months these nerves sprout and they actually grow back, and they actually go back to pretty much the original configuration so the pain all comes back because the joints are still bad joints…. [¶] … [¶]

"… You know, I'd say we would consider it a good outcome if people get 50 percent improvement, that would be great. If they can reduce their pain medications, that would be great. If they can improve their everyday activities and activities around the house, that's great. But we don't expect [a] cure from this."

Jordan performed a rhizotomy on January 8, 2009, after which Adolph complained of postoperative soreness for at least four weeks. Although his pain somewhat improved, Adolph still needed pain medication. Jordan administered another facet block on November 10, 2009, and reconfirmed that the pain emanated from the cervical facet joints. He performed a second rhizotomy on December 29, 2009, after which Adolph experienced less postoperative discomfort, took less pain medication, and experienced relief for five months. Jordan performed three additional rhizotomies on May 5, 2010, September 28, 2010, and February 15, 2011, respectively. Jordan opined that the April 30, 2007, accident caused Adolph's physical condition.

Dr. Lester Zackler, a neuropsychiatrist, reviewed Adolph's medical history and conducted an examination on December 6, 2010. He rated Adolph a 41 to 50 on the

6.

Social and Occupational Functional Assessment Scale, which indicated "serious impairment." Zackler diagnosed cognitive disorder, pain disorder, major depressant disorder, and panic disorder in remission and attributed these maladies to the April 30, 2007, accident. He also remarked that Adolph sustained sexual dysfunction:

> "Zoloft … is an antianxiety, anti-depression medication…. [¶] … [¶] … The medication has been helpful. He is [nowhere] near as depressed as he had been. The panic attacks aren't as frequent as they had been…. [¶] … [¶] … [The medication] has side effects. Among the problems that -- I didn't list it because it's almost taken for granted, is [Adolph] has impaired sexual function. He has both erectile dysfunction and decreased interest or decreased libido…. [¶] … [¶]
>
> "… He had been sexually active up until the time of the incident. And since the accident, his sexual drive and behavior has dramatically deteriorated. And it's understandable in terms of two factors: One, when you're anxious and depressed and in pain, you're not interested in having sex…. [I]t's not the way we're built. And secondly, medications like Zoloft, like the opiates, like some of the other medications he's been taking, affect sexual drive and sexual performance. Zoloft causes delayed ejaculation. In doses that he's taking it, one can barely have an orgasm. And so people lose motivation. And so his sexual dysfunction has been really a secondary issue. It wasn't caused directly by this head and neck injury, but instead has followed as a result of the pain and medications."

Zackler recommended additional medication, such as Wellbutrin, to offset Zoloft's side effects.

Dr. Daniel Zehler, a neuropsychologist, testified that Adolph's evaluations, dated August 13, 2007, and September 18, 2009, respectively, documented abnormal mental processing speed, visual and auditory deficiencies, memory deficits, and other cognitive weaknesses as well as ongoing pain, anxiety, and depression. He stated a side effect of ongoing pain was "sexual dysfunction" and decreased libido.[9] He rejected the notion that Adolph was a malingerer:

---

[9]    Zehler also testified that a diminished libido is a common side effect of Zoloft, which was prescribed for Adolph's depression.

"[O]ne of the things that we see with chronic pain patients is that if you have depression, if you have a mood disturbance, if you're anxious and discouraged and depressed, your pain level objectively may not have changed, but you will report higher levels of pain when you're down, when you're discouraged. It just hurts more. You know, pain is one of those things if you're distracted or you're involved, sometimes it hurts less…. [W]ith my chronic pain patients, when their mood improves, their pain complaints go down. And certainly [Adolph's] mood improved somewhat with the medication, it didn't clear it up. But you'll see this type of pattern that … as the depression intensifies, you get more pre-occupation with pain, and I think that was illustrated in this case as well. [¶] … [¶]

"… [A]fter [Adolph] left CNS, he still had the pain pattern, and I think without the structure of the program, inevitably pain took on more and more of a dominating impact in his life and really has gotten to the point where, you know, he's had a hard time functioning across the board."

Zehler opined that Adolph's neuropsychological problems were "clearly caused" by the April 30, 2007, accident.

Vivian testified that Adolph regularly hugged, kissed, massaged, and "spoiled" her and shared household responsibilities prior to April 30, 2007. After the accident, Adolph was usually lying down, unable to perform chores to the same extent, and seldom engaged in sexual activity. Vivian stated, "He's not my partner any more. He's like my child."[10] Florencia Sadoy, Vivian's sister, testified that Vivian, in caring for Adolph, was essentially confined to her home.

Frito-Lay called several physicians on its behalf. Dr. Barry Ludwig, a neurologist, testified that Adolph sustained a mild scalp injury as a result of the April 30, 2007, accident. He pointed out that the emergency physician at Sierra View District Hospital rated Adolph a 15 on the Glasgow Coma Scale, which equated to "perfectly normal." Ludwig added:

---

**10** The record indicates that Frito-Lay's counsel opted not to cross-examine Vivian.

"[A] simple blow to the head doesn't cause a concussion because … we've got helmets on. Our skull protects our brain. And most of the energy that's applied to the head is absorbed or transmitted through the skull. [¶] If the blow were severe enough, if this 130-pound object really hit him head on, what you'd expect to see is maybe a skull fracture, a little bleeding underneath where the bone was hit, maybe a bruise of the brain, but that kind of impact does not cause a concussion. [¶] … [¶] The kind of thing that causes concussions are acceleration/deceleration, falls from height, or angular velocity, twisting movements because that can stretch brain cells. So this is not the mechanism for a concussion."

Ludwig noted that Adolph's evaluations, dated July 11, 2007, and September 18, 2007, respectively, documented signs of improvement. In particular, Adolph had fewer headaches, better cognitive function, minimal neck pain, and unrestricted cervical range of motion. Based on these evaluations, Ludwig concluded that Adolph's scalp laceration had resolved and his neck strain should have resolved. He explained, "Once you get better after a head injury, it should continue to get better. That's the natural history of a head injury. You don't then suddenly get worse from a brain perspective. The brain heals." Ludwig opined that Adolph remained symptomatic because of his addiction to narcotic pain medication:

"I think he's on too much medication. He's on narcotics. He's basically addicted to narcotics. And what happens is when you're addicted, you get a rebound phenomenon. [¶] … [¶] … You take narcotics. It starts to get out of your system. The headache comes back. The only way you can get rid of the headache is by taking more narcotic.[11] [¶] … [¶]

---

**11** Zackler countered:

"There's a difference between addiction and physical dependency. With drugs like the opiates, he's taking one called Norco. It's a high potency pain reliever that can cause physical dependency. If you stopped it abruptly yourself, you'd say give me more of it. Simple as that. But he doesn't engage in any addictive behavior. He hasn't spontaneously increased his dose. He doesn't take more than is recommended. He doesn't go doctor shopping. He doesn't have any history of alcohol or chemical dependency issues. So I do not see him as having a problem with medication dependency or addiction in any negative sense."

"… He needs to be seen by someone who can gradually wean him off narcotics, get him on an appropriate drug regimen, to re-orient him towards a healthy lifestyle, someone to educate him. I mean, I think sending him to [CNS] and making him think that he had a brain injury was one of the worst things that could have been done. [¶] … [¶] … [T]his was a scalp injury. I mean, somebody should have said, you know, the natural history, even if this was a mild concussion, the overwhelming majority of people get better within a number of weeks, so this is something that you're gonna work through, it's going to gradually get better. We'll put you on an exercise program. We'll gradually get you back to work. And this is all going to resolve. [¶] What this did was emphasize to him that he had a brain injury. And enough people tell you you have a brain injury, you begin to believe it."

Ludwig did not believe that Adolph was a malingerer.

Dr. Richard Ruffalo, a clinical pharmacologist, testified that Adolph sustained neuropathic pain due to the April 30, 2007, accident, but was not properly prescribed anti-neuropathic pain medications such as Pregabalin and Gabapentin, which are non-opiate, are non-addictive, and contain fewer side effects. Ruffalo attributed Adolph's physical and mental sluggishness to his narcotic pain medication:

"That's the usual … effect especially when you're starting out, they're much more severe then, you develop some tolerance to some degree, but not full, from the sedating qualities, if you will, the mental slowness, you know, difficulty focusing, and so on, and so forth. [¶] … [¶] … With the appropriate therapy, early intervention, tapering down off the opiate,… combining it with non-steroidal anti-inflammatory, anti-neuropathic medicines usually at least a couple of them, and over a period of probably a month, and then getting into physical therapy because then he'd feel better to be able to do the physical therapy and that's basically the key."

Ruffalo acknowledged that Adolph took Zoloft to treat his depression, and that the use of Zoloft has the side effect of sexual dysfunction.

Dr. William Dillin, a spine surgeon, testified that multiple nerve blocks are required before a rhizotomy to avoid a false positive:

"The criteria for doing a rhizotomy has been worked out and published by the different societies, and it requires that you do the medial

branch block, first time. You have to have 80 percent relief, independent documentation, increased functional capacity. Then at least two weeks later, you do it again. You've got to fit the same criteria. You've got to get 80 percent, independent documentation, increased functional capacity, ability to perform previously painful movements. [¶] So if you have two of these that line up with th[ese] criteria, then the rhizotomy becomes the procedure of choice to try to desensitize this joint by affecting that nerve.… [¶] … [¶] So to do any cervical rhizotomy, you have to do either two blocks for the anatomic control, three blocks with the physiologic control, or two blocks for the comparative. Never one block. Minimum criteria."

He added that a physician must "document unequivocally that [a patient] ha[s] a 50 percent consistent relief of pain,… improved functional status, return[ed] to work normally, improved psychological status, and significant reduction in their medicines" to justify repeat surgery.

Dillin criticized Jordan for administering a single, left-sided facet block before Adolph's first rhizotomy and a second block after the procedure. He also criticized the lack of pain diaries and other documentation detailing the effectiveness of the first rhizotomy and the necessity of subsequent rhizotomies. Regarding alternatives to the surgery, Dillin remarked:

"[Y]ou could have done other invasive diagnostic tests …. [Y]ou could have done other testing in that area. Or you could have said no, you know what, maybe I'll just switch strategies, … maybe we'll get him detoxed or put another substitute medication, re-condition him, try to get all these other medicines consolidated and globally, without specifically targeting the piece of anatomy, try to improve his clinical situation. [¶] … [¶]

"… It's rehabilitation. So you're taking somebody and you're trying to make their life better. Now, will procedures give us the value to rehab someone? And if we don't have that documentation, we go to the non-procedural aspect, and we use exercise, conditioning, medication changes, ergonomic types of issues, psychological support, all these things that help you improve their quality of life."

Dr. Charles Furst, a neuropsychologist, examined Adolph on August 26, 2010, and diagnosed psychological adjustment disorder and somatoform disorder, the latter of which "describes a person who amplifies their level of pain … because of their

psychological condition." He disagreed with Zackler's diagnosis of major depressant disorder. Furst did not believe Adolph was a malingerer.

Frito-Lay played sub rosa video footage showing Adolph pumping gasoline on September 4, 2010, attending a gun show on September 5, 2010, visiting an amusement park on December 3, 2010, and climbing a ladder and standing on a roof on December 24, 2010.[12]

## DISCUSSION

### I.  Standard of review

"The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial." (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506; accord *Ray v. Jackson* (1963) 219 Cal.App.2d 445, 451.) "When the trial court has resolved a disputed factual issue, the appellate courts review the ruling according to the substantial evidence rule." (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.)

The substantial evidence rule consists of two aspects. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632.) First, "we consider the evidence in the light most favorable to the judgment, accepting every reasonable inference and resolving all conflicts in its favor." (*Westphal v. Wal-Mart Stores, Inc.* (1998) 68 Cal.App.4th 1071, 1078; accord *Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.) A determination by the trier of fact "comes to us cloaked with the presumption that it is correct" (*Westphal v. Wal-Mart Stores, Inc.*, *supra*, at p. 1074) and "is entitled to great deference because the [trier of fact], having been present at trial, necessarily is more

---

**12**     Jordan testified that the footage validated the efficacy of the rhizotomies:  "… I would expect [Adolph] to be doing more things around the house, repairing things and homework, fixing things, driving.  I wouldn't particularly recommend him climbing ladders and getting up on the roof but that shows how good this radiofrequency procedure was."

12.

familiar with the evidence and is bound by the … demanding test of weighing conflicting evidence" (*id.* at p. 1078). We, on the other hand, "do not reassess the credibility of witnesses or reweigh the evidence." (*Ibid.*; see *In re Michael G.* (2012) 203 Cal.App.4th 580, 589 ["The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts."].)

Second, we decide whether substantial evidence supported the ruling. Substantial evidence is reasonable, credible, of solid value, and of ponderable legal significance. (*Kuhn v. Department of General Services, supra,* 22 Cal.App.4th at p. 1633.) An award of damages that is supported by substantial evidence will not be disturbed. (*Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 691.) "'An appellate court may interfere with [a trier of fact's determination of damages] only where the sum awarded is so disproportionate to the evidence as to suggest that the verdict was the result of passion, prejudice or corruption [citations] or where the award is so out of proportion to the evidence that it shocks the conscience of the appellate court. [Citations.]'" (*Johnson v. Stanhiser* (1999) 72 Cal.App.4th 357, 361; accord *Seffert v. Los Angeles Transit Lines*, *supra*, 56 Cal.2d at p. 507; *Ray v. Jackson*, *supra*, 219 Cal.App.2d at p. 451.)

## II. Substantial evidence supported the jury's awards for Adolph's pain and suffering

"Noneconomic damages compensate an injured plaintiff for nonpecuniary injuries, including pain and suffering." (*Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1332.) Pain and suffering "encompass[] physical pain and various forms of mental anguish and emotional distress" (*ibid.*, citing *Capelouto v. Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892-893) and "are detriment factors for which an injured plaintiff must be compensated if [they] are caused by defendant's tort" (*Hilliard v. A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 413, citing Civ. Code, § 3333). "Admittedly these terms refer to subjective states, representing a detriment which can be translated into monetary

13.

loss only with great difficulty." (*Capelouto v. Kaiser Foundation Hospitals*, *supra*, at p. 893; see *Torres v. Los Angeles* (1962) 58 Cal.2d 35, 53 ["Because injuries are rarely identical in nature and the amount of pain and suffering endured as a result of similar physical injuries varies greatly, the extent of damages suffered cannot be measured by an absolute monetary standard."].) Our Supreme Court explained:

> "One of the most difficult tasks imposed upon a jury in deciding a case involving personal injuries is to determine the amount of money the plaintiff is to be awarded as compensation for pain and suffering. No method is available to the jury by which it can objectively evaluate such damages, and no witness may express his subjective opinion on the matter. [Citation.] In a very real sense, the jury is asked to evaluate in terms of money a detriment for which monetary compensation cannot be ascertained with any demonstrable accuracy…. 'Translating pain and anguish into dollars can, at best, be only an arbitrary allowance, and not a process of measurement, and consequently the judge can, in his instructions, give the jury no standard to go by; he can only tell them to allow such amount as in their discretion they may consider reasonable…. The chief reliance for reaching reasonable results in attempting to value suffering in terms of money must be the restraint and common sense of the jury….' [Citation.]" (*Beagle v. Vasold* (1966) 65 Cal.2d 166, 172; see Civ. Code, § 3359.)

In other words, the jury generally has "relatively unfettered authority and responsibility to calculate damages for pain and suffering." (*Garfoot v. Avila* (1989) 213 Cal.App.3d 1205, 1210.)

An injured plaintiff may be compensated not only for pain and suffering "'which have occurred up to the time of the trial'" (*Bellman v. San Francisco H. S. Dist.* (1938) 11 Cal.2d 576, 588), but also for pain and suffering that "'[are] reasonably certain under the evidence [to] follow in the future'" (*ibid.*; accord *Mella v. Hooper* (1927) 200 Cal. 628, 631, citing Civ. Code, § 3283). With respect to prospective damages, "'[t]he jury may not consider consequences which are only likely to occur. "To entitle a plaintiff to recover present damages for apprehended future consequences, there must be evidence to show such a degree of probability of their occurring as amounts to a reasonable certainty

that they will result from the original injury." [Citations.]'" (*Bellman v. San Francisco H. S. Dist.*, *supra*, at p. 588.)

Substantial evidence demonstrated that Adolph sustained a scalp laceration, cervical joint pain, various cognitive impairments, and depression, inter alia, due to the April 30, 2007, accident. He was prescribed narcotic pain medication and attended physical therapy and rehabilitation. However, Adolph continued to suffer pain and subsequently underwent five cervical rhizotomies in a two-year span. Although he found significant, albeit temporary relief for up to five months after each surgery, he would initially experience up to six weeks of postoperative pain and inflammation. Furthermore, Adolph's use of Zoloft, which successfully treated his depression, led to sexual dysfunction.[13] Medical experts for both parties agreed that he did not malinger. Thus, the jury properly found that Adolph was entitled to damages for past pain and suffering. (Cf. *Hilliard v. A. H. Robins Co.*, *supra*, 148 Cal.App.3d at p. 413 ["An award failing to compensate an injured plaintiff where pain and suffering was present is inadequate as a matter of law."].) Regarding the $75,000 sum, we cannot conclude that this amount was so disproportionate as to "'shock[] the conscience'" (*Johnson v. Stanhiser*, *supra*, 72 Cal.App.4th at p. 361) or implicate passion, prejudice, or corruption (*ibid.*), particularly because the evidence showed that Adolph's level of pain and suffering fluctuated. While Adolph contends that the $75,000 award for past pain and suffering was inconsistent in view of the $90,896 award for past lost earnings and $340,000 for past medical expenses, "[t]he ratio between special and general damages is

---

[13]    "Medical treatment for the resulting injuries is a kind of physical harm for which the defendant is liable whether or not the treatment is itself negligent." (*Munoz v. Davis* (1983) 141 Cal.App.3d 420, 426; see *Hastie v. Handeland* (1969) 274 Cal.App.2d 599, 605, quoting Rest.2d Torts, § 457 ["'If the negligent actor is liable for another's bodily injury, he is also subject to liability for any additional bodily harm resulting from normal efforts of third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or a negligent manner.'"].)

not controlling. Special damages such as hospital and physicians' charges are capable of exact determination and general damages cannot be calculated on the amount paid for such charges." (*Wood v. Davenport* (1954) 127 Cal.App.2d, 247, 252.)

Likewise, we see no reason to disturb the jury's $0 award for Adolph's future pain and suffering. Substantial evidence indicated that his extant pain and suffering could be alleviated within one month by anti-neuropathic medications such as Pregabalin and Gabapentin, which lack the side effects of opiate pain relievers yet were not prescribed. Ruffalo opined that this new drug regimen would not only mitigate Adolph's pain, but also improve his mindset, which Zehler highlighted as a key aspect of his physical symptoms. Moreover, under this new treatment program, Adolph would no longer be subjected to a seemingly endless cycle of rhizotomies. Hence, the jury could find that his pain and suffering were not reasonably certain to occur in the future. Adolph contends that this determination was inconsistent in view of the $40,064 award for future medical expenses. We reiterate that "[t]he ratio between special and general damages is not controlling." (*Wood v. Davenport*, *supra*, 127 Cal.App.2d at p. 252.) To the extent Adolph suggests that a jury must award for future pain and suffering if it awards for future medical treatment, we disagree.[14] Given the evidence that an alternative course of treatment could effectively manage his pain and curtail surgical intervention, we see no

---

[14] Adolph cites *Dodson v. J. Pacific, Inc.* (2007) 154 Cal.App.4th 931. In *Dodson*, the plaintiff sustained injuries due to the defendant's negligence and underwent surgery to remove a herniated disc and insert a metallic plate. The jury awarded him $16,679, which covered the surgical expenses, but did not compensate him for pain and suffering. (*Id.* at pp. 932-935.) The appellate court reversed the judgment, holding that "where a plaintiff has undergone surgery in which a herniated disc is removed and a metallic plate inserted, and the jury has expressly found that defendant's negligence was a cause of plaintiff's injury, the failure to award *any* damages for pain and suffering results in a damage award that is inadequate as a matter of law." (*Id.* at p. 933, italics added.) In contrast to *Dodson*, the jury in the instant case awarded Adolph $75,000 for pain and suffering arising from the rhizotomies, inter alia. Furthermore, *Dodson* did not address a jury's decision not to award for future pain and suffering, a point Adolph concedes.

incongruity in the jury's decision to award for future medical expenses, but not for future pain and suffering.

**III. The jury's finding that Vivian was not entitled to damages for loss of consortium was not supported by substantial evidence**

Consortium refers to "'""the noneconomic aspects of the marriage relation, including conjugal society, comfort, affection, and companionship"'"" and "encompasses sexual relations, moral support, and household services." (*Mealy*, *supra*, 195 Cal.App.4th at p. 1223.) When a person's spouse "is negligently injured" and "no longer capable of providing the love, affection, companionship, comfort or sexual relations concomitant with a normal married life," the person is "'""deprived of [the] full enjoyment of [the] marital state."'"" (*Lantis v. Condon* (1979) 95 Cal.App.3d 152, 157.)

A cause of action for loss of consortium has four elements: (1) a valid and lawful marriage between the plaintiff and the person injured at the time of the injury; (2) a tortious injury to the plaintiff's spouse; (3) loss of consortium suffered by the plaintiff; and (4) the loss was proximately caused by the defendant's act. (*LeFiell Manufacturing Co. v. Superior Court* (2012) 55 Cal.4th 275, 284-285.) A "partial loss" or "diminution" of consortium is compensable (*Mealy*, *supra*, 195 Cal.App.4th at p. 1224) so long as the loss "is sufficiently serious and disabling to raise the inference that the conjugal relationship is more than superficially or temporarily impaired" (*Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 932-933).

The jury ruled in favor of Adolph on the negligence claim and awarded him noneconomic damages for past pain and suffering. The testimonies of Adolph, Zackler, and Zehler on behalf of Adolph and the testimony of Ruffalo on behalf of Frito-Lay supported that verdict. Those witnesses also confirmed that Adolph sustained depression, inter alia, as a result of the accident, was prescribed the antidepressant Zoloft, and experienced decreased libido and erectile dysfunction, which affected the noneconomic

17.

aspect of his marriage relation.  Thus, their testimonies supported Vivian's loss of consortium claim.

Frito-Lay asserts the jury was free to find Vivian's testimony not credible.  That a jury "does not credit a witness's testimony," however, "does not entitle it to adopt an opposite version of the facts which otherwise lacks evidentiary support." (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1205.)  In our review of the record, we found no substantial evidence to support the jury's award of $0 for Vivian's loss of consortium.  Regarding Adolph's sexual dysfunction, Vivian's testimony was analogous to the testimonies of Adolph, Zackler, Zehler, and Ruffalo.  If the jury found Vivian's testimony not credible, then the jury somehow deduced that Adolph's, Zackler's, Zehler's, and Ruffalo's testimonies, although credible on the negligence claim, were not credible on the loss of consortium claim.  Frito-Lay fails to point to anything in the record that would justify such dissection by the jury.  To countenance this finding would require inferences from the evidence "that are the result of mere speculation or conjecture." (*Kuhn v. Department of General Services*, *supra*, 22 Cal.App.4th at p. 1633.)  Such inferences cannot support a finding of substantial evidence. (*Ibid.*)  Furthermore, there is evidence in the record to the contrary.  It appears from the determination that Adolph was not entitled to receive compensation for future pain and suffering that the jury credited Ruffalo's entire testimony.  It was Ruffalo who testified that a new drug regimen consisting of anti-neuropathic medications, rather than opiate pain relievers, would effectively manage Adolph's pain and suffering within a short period of time.  When compared to Frito-Lay's other expert witnesses on the matter, Ruffalo, whose field of expertise pertains to drug interactions, provided the most detail on how this alternative course of treatment would effectively treat Adolph's chronic pain and render narcotic pain medication and Zoloft obsolete.[15]

---

[15]    Frito-Lay does not assert that the jury found the testimony of Ruffalo, its own witness, not credible.

The record does not support the conclusion Frito-Lay asserts. Accordingly, the judgment as to Vivian's claim is reversed.

## DISPOSITION

The judgment is reversed as to Vivian's loss of consortium claim and the matter is remanded for a new trial limited to the calculation of damages. The judgment is affirmed in all other respects. The postjudgment order granting Vivian's motion to tax costs is reversed with directions to the superior court to dismiss the postjudgment action as moot. The parties are to bear their own costs on appeal.

_____
DETJEN, J.

WE CONCUR:


_____
HILL, P.J.


_____
LEVY, J.

19.