Filed 10/8/21

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| JENARO CARRASCO, | |
| Plaintiff and Appellant, | E072892 |
| v. | (Super.Ct.No. CIVDS1514663) |
| STATE PERSONNEL BOARD, | OPINION |
| Defendant and Respondent; | |
| DEPARTMENT OF CORRECTIONS AND REHABILITATION, | |
| Real Party in Interest and Respondent. | |


APPEAL from the Superior Court of San Bernardino County. David Cohn, Judge. Affirmed.

Robert Lucas Law, Robert W. Lucas; Phillips & Rickards and Wendell Phillips for Plaintiff and Appellant.

Alvin Gittisriboongul and Dorothy Bacskai Egel for Defendant and Respondent.

Nechelle L. Bixby for Real Party in Interest and Respondent.

Plaintiff and appellant Jenaro Carrasco worked as a parole agent for real party in interest Department of Corrections and Rehabilitation (department) for five years. He was then promoted to the position of special agent and was subject to a 12-month probationary period. The department served Carrasco with a notice of rejection before the end of the probationary period and stated six reasons for the rejection. Carrasco challenged his rejection before defendant and respondent the State Personnel Board (the board) and, when the board upheld his rejection, he petitioned the superior court for a writ of administrative mandamus.

At the conclusion of the administrative and superior court proceedings, only two of the reasons given for Carrasco's rejection were found to have been supported by substantial evidence. However, both the board and the superior court concluded Government Code[1] section 19175—the statute that governs the board's review of the decision to reject a probationer—does not mandate reinstatement if less than all the reasons given for the rejection are upheld. In addition, the board and the superior court

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

concluded the department had not acted in bad faith when it rejected Carrasco. Therefore, the superior court denied Carrasco's petition.

In this appeal from the judgment denying Carrasco's petition, we hold: (1) section 19175, subdivision (d), does not require the board to reinstate a rejected probationer if at least one of the reasons given for the rejection is supported by substantial evidence; (2) the administrative record supports the board's findings that substantial evidence supported the two remaining reasons for Carrasco's rejection; and (3) the record supports the board's findings that the department did not act in bad faith when it rejected Carrasco. We affirm the judgment.

I.

FACTS AND PROCEDURAL BACKGROUND

*A.*      *Rejection of Carrasco During Probation.*

After 20 years of service as a probation officer, in April 2008, Carrasco was hired by the department as a parole agent. On July 31, 2013, he was promoted to special agent within the Office of Correctional Safety (OCS) Special Services Unit. Carrasco was subject to a 12-month probationary period for his new position, and he reported for duty on August 1, 2013.

On June 23, 2014, the department served Carrasco with a "Notice of Rejection During Probation Period." The notice listed six reasons for Carrasco's rejection: (1) he failed to exit his vehicle to assist in a foot pursuit of an escapee in

3

September 2013; (2) he failed to follow instructions during a tactical training exercise conducted in January 2014, and he was discourteous and refused to follow instructions from his supervisor; (3) he failed to follow instructions from his supervisor in October 2013 to work on a "cold case" and neglected to "develop any investigative work on the case" from the time of the instructions to February 2014; (4) he failed to timely submit a report within six business days of a March 2014 arrest, falsified the report to indicate it had been timely submitted, and failed to include necessary information; (5) in April 2014, he failed to respond to "'call-outs'" from his supervisor and a fellow agent for assistance in capturing an escapee while he was on "'call-out'" rotation, and he had not previously submitted a request to be excused from "'call-out'" duty; and (6) he failed to follow a "verbal agreed-upon protocol" while attending an April 2014 meeting at the Orange Police Department.

B.  *Administrative Appeal and Evidentiary Hearing*.

Carrasco appealed the rejection, and an administrative law judge (ALJ) with the board conducted an investigatory hearing on January 22, 2015.

### 1. *Reason 2: Simunition® training.*[2]

With respect to reason 2 for Carrasco's rejection, the notice of rejection stated that, during Simunition®[3] training conducted on January 25, 2014, he "failed to follow instructions" from his instructors, special agents Mory and Marks, and he was "discourteous when [he] refused to accept corrective suggestions" about his performance during a room-entry exercise. The notice quoted a document entitled "Special Agent Essential Functions," which provides, inter alia, a special agent "[m]ust be able to accept *constructive criticism, feedback and use supervisory direction positively*." Finally, the notice stated Carrasco "made excuses throughout this training session for not following training procedures that [his] instructors exposed [him] to," he was "argumentative with [his] instructors when they provided constructive criticism and feedback," and he "failed to accept responsibility for [his] training mistakes." All this "demonstrate[ed] [his] inability to utilize supervisory direction positively by working toward improvement to align [himself] with [the department's] mission and OCS's safety procedures."

---

[2] As explained further, *post*, by the time the superior court entered its judgment and Carrasco appealed, only two of the reasons given for the rejection (reasons 2 & 4) were found to have been supported by substantial evidence. Those are the only reasons for the rejection that are at issue in this appeal. Therefore, we will only set forth the evidence presented during the evidentiary hearing that pertains to those reasons.

[3] Simunition® (simulated ammunition) is the brand name for nonlethal training ammunition manufactured by the defense contractor General Dynamics. (*Simpson v. General Dynamics Ordinance and Tactical Systems-Simunition Operations, Inc.* (N.D. Ind. 2019) 429 F.Supp.3d 566, 571-572; see *Moore v. Guthrie* (10th Cir. 2006) 438 F.3d 1036, 1038.)

5

Parole agent Lee was present during the training exercise. He testified that, neither during the room-entry exercise nor during the "briefing after each scenario," did he observe Carrasco to be belligerent or hear him say anything he would characterize as discourteous. When asked if he heard Carrasco "talk over" the instructors during the debriefings, Lee testified, "No. I don't know. No." Lee explained he "was there" during the training but he was not a trainee—he was one of the "role players" to "get shot [in] the scenario," and was not one of the agents "going through the houses." When asked again whether he heard Carrasco say anything discourteous, Lee answered, "I hardly left that house. I was inside the house . . . preparing for each scenario." Finally, Lee testified he was not present "all the times" that Marks and Mory spoke to Carrasco.

Carrasco testified he had no conversations with Marks or Mory during the training, and he did not say anything that could be characterized as discourteous. Carrasco described the room-entry exercise, during which he kicked open a door and, when it did not close all the way, he instinctively pointed his weapon at the door because there might be someone behind it with a weapon. He told his team member, "check the door." Carrasco testified that, after the exercise, he was told he "should have rode [*sic*] the door and come around the door and confront the subject" himself. This concerned and confused Carrasco. "I asked if I come around and face the subject. I'm in the room with him by myself with him and my gun's pointing toward my team members. That's the only statement I made." Carrasco denied that he said he "knew better or anything of that nature," or that he was "trying to be a know-it-all."

6

Marks testified the training exercise involved tactical officers entering buildings and rooms under various dangerous scenarios. During the training, he became concerned that Carrasco had difficulty grasping some of the concepts and procedures the course was designed to teach. Marks tried to explain to Carrasco "how things needed to be done" and "how we normally do them and what's safe and what's not safe," by "making corrections and whatnot." Carrasco "appeared to be resistant" to correction. Marks and Mory believed Carrasco had missed "a threat to the team that he didn't address properly" but, "when it was explained to him, he said that he didn't believe he had done that. So from there on it was somewhat of a no, I didn't." Because Carrasco was a new special agent, Marks thought that if Carrasco "did something wrong, [he would] want to make the correction. You can't correct something if someone doesn't believe he did something incorrect."

More specifically, Marks testified that, during the "room-entry" exercise, he observed Carrasco encounter a person behind a door but, instead of "fully addressing it where he wasn't sure if someone was behind it," he "yelled out for another agent to address the threat" and "he passed the door." According to Marks, this concerned him because "[w]e always address threats as we encounter them. So if I'm the first person at the front door and there's a threat there, I have to address it. If I don't, the person behind me may get shot or hurt . . . ." Marks and Mory addressed their concerns about Carrasco's performance during a group "debriefing of the scenario." They told Carrasco that "he could have rode [*sic*] the door"—pushed his body against the door—"to make

7

sure that person couldn't come outside." But, he "refused to listen" and "talk[ed] over" them while trying to explain why he believed he had acted correctly during the exercise.

Rather than stop the class to further address Carrasco, Marks continued the class while Mory "pulled [Carrasco] aside and spoke to him one-on-one." Marks overhead some of the conversation, and "it didn't seem like [Carrasco] was ready to move on." When asked if Carrasco had been discourteous, Marks testified he was "somewhat resistant to listening, is what I would say. Somewhat of I've been there, done that." Carrasco was not rude, and he did not use foul language. He "was defending what he did" and "was saying he didn't do what we said he did." According to Marks, "we couldn't get to the corrective discussion because he said it never happened, and we observed it to happen."

In a March 12, 2014 memorandum to senior special agent Santos, Marks wrote that, when Carrasco continued to talk over Marks and Mory and continued to insist on explaining why he believed he had done nothing wrong during the room-entry exercise, Marks explained to Carrasco "that he would need to follow training directives without continually making excuses." However, "[d]uring other scenarios, SA Carrasco made additional excuses for not following the training procedures that instructors exposed him to." Based on his training and experience, Marks was of the opinion "Carrasco lack[ed] the desire or ability to learn [OCS] policies and procedures" because he appeared to be "unwilling to listen to constructive criticism given by multiple OCS instructors." Marks also opined "Carrasco was unable to accept any responsibility for training mistakes

during the training," and he was therefore "unable to work toward or display improvement."

>2. *Reason 4: Late and incomplete arrest report.*

Reason 4 for the rejection stated that Carrasco failed to submit a report about a March 26, 2014 arrest to Santos, his supervisor, by April 4. "Per standard operating procedures, arrest reports are due within six (6) days of incident dates." Carrasco "falsified" the report to indicate he had submitted it on March 27, when in fact he submitted it on April 9. The notice quoted a document entitled "Special Agent Duty Statement," which described the duty to prepare "lengthy, clear and concise reports" during and at the conclusion of investigations. In addition, the notice indicated Carrasco failed to include "the required elements" for an arrest report, and he failed to identify his role as lead investigator in the report and during searches conducted incident to the arrest, among other things.

When Carrasco was promoted to the position of special agent in August 2013, senior special agent Moreno was assigned to train him. Part of the training included "showing him what paperwork needed to be done for different arrests, different report writing, different threat assessments, [and] different escapes." Carrasco did not, however, receive classroom training on report writing because the OCS academy had been cancelled.

Santos testified he expects special agents under his command to submit reports within six days of an incident. He testified the six-day rule is not found in the department's operations manual, but it "comes from minute meetings" when a special

9

agent is hired and "it's an office expectation[]." He described the rule as "a local expectation," "just instructions." Santos testified he had specifically instructed Carrasco to submit a report for the March 26, 2014 arrest within six days. "On the sixth day, he kept saying that he didn't have follow-up documents, and I sent it back for corrections. He actually sent the report. When I finally got the report for—for review and correction, I got it—it wasn't sent to my office tech for rewrite and correction until April 9th."

The report Carrasco submitted to Santos stated it was submitted on March 27, but Santos testified he did not receive it after rewriting and correction until April 10 and, therefore, the report was not timely submitted pursuant to his instructions. When asked why it is important for arrest reports to be timely submitted, Santos testified, "For filing with district attorneys, for office liabilities, for court purposes, and it's also an office expectation and protocol to have them in within six days." In addition, Santos testified that, because the arrest in question resulted in the seizure of cash, he would have expected the report to have certain attachments, specifically, an asset forfeiture form and a consent to search form. The rewritten and corrected report Carrasco submitted on April 10 did not have those forms attached to it, although he submitted them later, "well after . . . the final draft. I had to keep requesting these forms to be submitted with the . . . report." Santos also noted inconsistencies in the report, such as Carrasco indicating he was in two places at the same time. Finally, Santos testified the report omitted some information.

Carrasco testified that, in a meeting held in 2013, he "was made aware of" the expectation that arrest reports had to be submitted within six days. And he acknowledged that he submitted the report in question late and that it was incomplete.

C.   *The Board's Decision Upholding Carrasco's Rejection.*

In a proposed decision, the ALJ found substantial evidence supported reasons 1 through 5 for Carrasco's rejection, but not reason 6, and it rejected Carrasco's assertion that the department acted in bad faith by rejecting him during probation.  The board adopted the ALJ's findings of fact and determination of issues, and upheld Carrasco's rejection.  The board later denied Carrasco's petition for rehearing.

D.   *Petition for Writ of Administrative Mandamus and Superior Court Proceedings.*

Carrasco filed a petition for writ of administrative mandamus in the superior court. In his briefs, he argued substantial evidence did not support the five reasons for his rejection that were upheld by the board, and that the department had acted in bad faith when it rejected him.  In its tentative ruling, the superior court ruled substantial evidence did not support reasons 1 and 3 for Carrasco's rejection, but that substantial evidence supported reasons 2, 4, and 5.  During the hearing, the court stated its intention was to adopt the tentative ruling but to only find reasons 2 and 4 (and not reason 5) were supported by substantial evidence, i.e., to find that Carrasco resisted corrective instruction (but not that he was discourteous) during Simunition® training (reason 2), and that he failed to timely submit an arrest report (reason 4).  The court directed the parties to file supplemental briefs addressing whether it would be appropriate to remand the case to the board for it to determine if the remaining two reasons were sufficient to sustain the rejection.

In his supplemental brief, Carrasco argued his rejection could not stand based solely on the two remaining reasons, and the superior court should set it aside and remand the case to the board for a new evidentiary hearing on reasons 2 and 4.

At the continued hearing, Carrasco argued his rejection was like "a table with six legs around the perimeter as a foundation, and it needed to rely on that foundation to be sustained." Because the board and the superior court in its tentative ruling in combination had "knocked out" four of those legs, the table would no longer stand. After hearing additional argument, the court ruled it would be appropriate to remand the case to the board for further consideration.

In its order, the court: (1) granted the petition and set aside the board's adoption of the ALJ's decision; (2) found that reasons 1, 3, and 5 for the rejection were not supported by substantial evidence, but that reasons 2 and 4 were supported by substantial evidence; (3) directed the board on remand to determine two issues: (a) whether "Carrasco should be restored to his position" pursuant to section 19175 because four of the six reasons for his rejection had been rejected, and (b) "whether the two surviving reasons for rejection were made in bad faith" within the meaning of section 19175; and (4) it retained jurisdiction to review the board's new decision.

E.    *Board Proceedings on Remand.*

Upon receiving the superior court's order, the board set aside its adoption of the ALJ's proposed order, remanded the appeal to the ALJ to conduct further proceedings and issue a new proposed decision, and directed the parties to file supplemental briefs. In his supplemental brief, Carrasco once more argued "the foundational underpinnings for

the rejection have now been rejected," and "the two remaining charges cannot support the rejection and it must be overturned." In addition, he argued that, because four of the reasons had been found to lack evidentiary support, the ALJ should conclude the department acted in bad faith when it rejected him.

In its brief, the department argued the two remaining reasons were sufficient to uphold the rejection and that, notwithstanding the fact the board and the superior court had rejected four of the six reasons given for the rejection, it did not act in bad faith.

During the hearing on remand to the ALJ, Carrasco argued that, considering four of the six reasons for his rejection had been found to be lacking in evidentiary support, the remaining two reasons were "even more suspect." Counsel for the department argued the fact the superior court had found three of the reasons for rejection were not supported by substantial evidence was not "indicia of bad faith. This is not a numbers game." With respect to whether the two remaining reasons were sufficient, counsel again argued "it isn't a numbers game." The two remaining reasons for the rejection showed Carrasco was "a bad fit" for his position "and he cannot perform at this job."

In a proposed decision, the ALJ concluded Carrasco's rejection during probation was supported by substantial evidence, and the rejection was not motivated by fraud or bad faith. In its factual findings regarding reason 2 for the rejection, the ALJ found that during the training exercise, an instructor observed Carrasco enter a small room, discover a person behind a door, then walk out of the room and ask a team member to confirm what he had seen. The other team member entered the room, discovered the person behind the door, "and immediately address[ed] the threat." Because Carrasco "did not

13

immediately address the threat when he discovered it," the instructor believed he had made a "tactical error" that needed correction. But, when the instructor tried to discuss the issue with Carrasco, he denied having made a tactical error "and insisted he did nothing wrong." When the instructor reminded Carrasco that he needed to follow training directives "without making excuses," he "continued to deny wrongdoing, and was not receptive to the training."

And in its factual findings regarding reason 4 for the rejection, the ALJ found Santos had directed special agents under his supervision to complete and submit arrest reports within six business days of the arrest, and Carrasco became aware of that directive in 2013. The directive from Santos "was not in writing" and was not "set forth in [the department's] policy manuals." Carrasco was the lead investigator for the arrest on March 26, 2014, yet he did not submit his report for rewriting and correction until April 9, four days late. Moreover, the ALJ concluded Carrasco's report contained many significant omissions.

The ALJ stated the first issue to be determined on remand from the superior court was whether the two remaining reasons for Carrasco's rejection, "standing alone, support [his] rejection during probation." The ALJ concluded, "they do." With respect to reason 2, the ALJ found Carrasco's "resistance to training on matters that may affect his safety, and the safety of his fellow peace officers, is not a trivial event and legitimately calls into question [his] suitability to work as a [special agent]." With respect to reason 4, the ALJ noted the timely completion and submission of accurate arrest reports "is an important component of a [special agent's] job duties." Failure to timely submit a

complete and accurate arrest report might jeopardize the prosecution of criminal suspects, and the department "has a legitimate concern that [Carrasco] is not suited for a [special agent] position when [he] demonstrated his inability to timely submit a complete crime report that contains all relevant and important information."

The ALJ also concluded Carrasco had not demonstrated that the department had acted out of bad faith when it rejected him during probation. The department had on three occasions notified Carrasco that his performance was poor and in need of improvement and, in the third notice, told him he was at risk of being rejected. Carrasco had been given additional training and the opportunity to improve. Therefore, the ALJ concluded the record did not show the department acted with the intent to deprive Carrasco of any benefit or with animus.

With respect to Carrasco's assertion that the lack of substantial evidence for four of the six reasons for the rejection was proof of bad faith, the ALJ concluded "bad faith cannot be determined by some quantitative standard that only measures the number of reasons ultimately found supported by substantial evidence versus the number of reasons that were not." The ALJ stated section 19175, subdivision (d), "contemplates that even a single reason supported by substantial evidence is sufficient to warrant . . . rejection during probation." The fact the board and the superior court had reached different conclusions about three of the reasons showed "reasonable minds may differ" about what constitutes substantial evidence to support a rejection. And, to the extent the number of reasons found to be lacking in evidentiary support is a "factor to consider" in the bad faith analysis, the ALJ concluded, "it must not be considered in isolation, but in the

15

context of an employee's entire probationary period."  The record demonstrated Carrasco had been provided with extensive training during the probation period and had been notified of performance deficiencies with enough time to remedy them.  Because he had been provided with "every opportunity to demonstrate his ability" to perform his job over an 11-month period, the number of reasons found to lack evidentiary support "does not establish [the department] acted in bad faith by illegitimately thwarting [Carrasco's] ability to pass probation."

In sum, the ALJ found Carrasco had not met his burden of proof.  The board adopted the ALJ's proposed order and once more upheld Carrasco's rejection.

### F.    Further Superior Court Proceedings on Carrasco's Petition.

After submitting the board's new decision to the superior court, Carrasco filed a supplemental brief in which he alleged the board had failed to address the first question contained in the superior court's remand order, to wit, whether the rejection could stand based solely on two of the six reasons given.  He stated the superior court's order showed it had "correctly reasoned . . . that the notice of rejection was an integrated whole resting on the sum of each of the six reasons for the rejection and recognized that, with the rejection of four of the six reasons, the fabric of the rejection had ripped."  However, according to Carrasco, the board ignored this supposedly clear message from the court and instead "focused . . . on the idea that it could view the two remaining reasons independently from the four rejected reasons to determine whether rejection remained appropriate."  In addition, Carrasco accused the board of looking beyond the reasons

16

stated in the notice of rejection and relying on other reasons to bolster its conclusion that substantial evidence supported the rejection.

Carrasco once more argued the department had "relied on six combined, interlocking reasons" for his rejection in the original notice, and the six reasons "connected to form the entirety of the rationale for the rejection and must be read together." And, because the board supposedly ignored the superior court's mandate, he argued the decision on remand should be subject to "heightened scrutiny" rather than the normal substantial evidence review. Finally, he argued the record contained substantial evidence that the department acted in bad faith when it rejected him.

The department filed a brief and argued the board did, in fact, comply with the superior court's direction on remand. "[The board] clearly found that the remaining two reasons for [the] rejection on probation were sufficient to constitute, on their own, substantial evidence to support [the] rejection on probation." It also argued the board correctly found that the remaining two reasons for the rejection were supported by substantial evidence, and that substantial evidence did not support Carrasco's claim that his rejection was the result of bad faith.

Carrasco responded to the department's brief and argued that, not only did the board ignore the superior court's mandate in its remand order, but its conduct was potentially sanctionable.

At the hearing on remand, Carrasco once more argued the six reasons given for his rejection had to be read as a whole. And, as he did in his first brief filed after the case was returned to the superior court, Carrasco addressed a video of the tactical training

17

exercise. The superior court indicated it had not been provided with the video, so it directed either party to produce the video as soon as possible, and it continued the hearing.

Carrasco lodged the training video with the court, and he filed a supplemental brief addressing in greater detail how the video disproved the board's findings of fact regarding the training exercise.

The department filed its own supplemental brief and once more argued the board did not ignore the superior court's mandate and, therefore, the decision on remand was not subject to heightened scrutiny. In addition, the department argued that, contrary to the suggestion in Carrasco's briefs, the video of the training exercise did not undermine the board's findings of facts. As the department noted, the notice of rejection did not rely on Carrasco's failure to properly "clear an unsecured door" as the reason for rejection. Instead, the notice accused Carrasco of refusing to accept "'corrective suggestions'" from his instructors, making excuses, and of being discourteous. The department argued the video was irrelevant because it focused on the "actions of the trainees" during the simulated building entry and "not any correction by instructors" after the exercise. According to the department, the administrative record, including the live testimony before the ALJ in the original hearing, constituted substantial evidence to sustain reason 2 for the rejection. Finally, the department argued there was no substantial evidence in the record that it acted in bad faith when it rejected Carrasco during probation.

Carrasco responded to the department's supplemental brief. He argued the video was relevant, it demonstrated that he acted appropriately during the training exercise, and he did not rebuff corrective suggestions from instructors or act discourteously.

During the continued hearing, the superior court indicated it was inclined to adopt its tentative ruling issued before the prior hearing and deny the petition. The court indicated it had viewed the training video, which it noted was interesting but "wasn't really exciting." The court stated the video had not changed its mind. "I don't think that what actually took place during the . . . training, what Mr. Carrasco was or was not doing, is the issue. But the issue is what took place after that and about that." After hearing additional arguments, the court took the matter under submission.

### G. Order and Judgment Denying Carrasco's Petition.

The superior court subsequently entered an order and written decision denying the petition. Addressing Carrasco's assertion "that [the board] failed to address substantively whether the Court could sustain a rejection . . . when two-thirds of the reasons presented for the rejection lacked merit," the court noted section 19175, subdivision (d), "does not prescribe a specific number of reasons required for rejection of a probationary employee." "Indeed," the court stated, the statute "implies a probationary employee may be rejected for a single reason." The court ruled Carrasco had not met his burden of demonstrating the remaining two reasons for his rejection were not supported by substantial evidence. "Based upon the seriousness of [Carrasco's] resistance to the . . . training, and the importance of submitting complete and timely arrest reports," the court

19

ruled, "the decision that [Carrasco] would not be returned to probation based upon the two remaining reasons, is appropriate."

The court also ruled Carrasco had not met his burden of demonstrating the department acted in bad faith. Specifically addressing Carrasco's claim that the department essentially cooked up reasons for the rejection by relying on incidents that took place after the decision to reject him had already been made, the court stated: "Other than his speculation, [he] provides no legal authority prohibiting or precluding [his] subsequent performance deficiencies to be included as a reason for his rejection. [The department] was not obligated to disregard any and all subsequent performance deficiencies after it made its tentative decision to reject [Carrasco's] probation."

Thereafter, the superior court entered a formal judgment denying the petition and Carrasco timely appealed.

II.

DISCUSSION

A.     *General Principles*.

"Article VII of the California Constitution provides that, generally, the civil service includes 'every officer and employee of the State' (*id*., art. VII, § 1, subd. (a)) and that permanent appointment and promotion in the civil service 'shall be made under a general system based on merit ascertained by competitive examination' (*id*., art. VII, § 1, subd. (b)). This constitutional mandate, known as the 'merit principle,' was adopted by California voters in 1934 in an effort to eliminate the 'spoils system' of political patronage from state employment and to ensure that 'appointments and promotions in

20

state service be made solely on the basis of merit.' [Citations.] Another constitutional provision, also adopted in 1934, calls for a nonpartisan personnel board (the [board]) to enforce the civil service statutes (Cal. Const., art. VII, §§ 2, 3, subd. (a)) and for an executive officer to administer the statutes under the [board's] rules (*id*., §§ 2, subd. (c), 3, subd. (b))." (*California State Personnel Bd. v. California State Employees Assn., Local 1000*, *SEIU*, *AFL-CIO* (2005) 36 Cal.4th 758, 764-765, fn. omitted.)

Under the State Civil Service Act (§ 18570 et seq.), a probationary civil service employee (a probationer) enjoys less protection than a regular incumbent to provide the appointing power the ability to test his or her fitness. "The object and purpose of a probationary period is to supplement the work of the civil service examiners in passing on the qualifications and eligibility of the probationer. During such period the appointive power is given the opportunity to observe the conduct and capacity of the probationer, and if, in the opinion of that power, the probationer is not fitted to discharge the duties of the position, then he [or she] may be discharged by the summary method provided for in the Civil Service Act before he acquires permanent civil service status." (*Wiles v. State Personnel Bd.* (1942) 19 Cal.2d 344, 347; see § 19172 ["During the probationary period the appointing power shall evaluate the work and efficiency of a probationer . . . ."].)

In evaluating whether the probationer exhibits "the proper qualifications to become a permanent civil service employee," the appointing power "is in the best position to form a conclusion." (*Boutwell v. State Bd. of Equalization* (1949) 94 Cal.App.2d 945, 949.) Consequently, the appointing power must be permitted to "exercise discretion and personal judgment in determining whether a probationary

21

employee shall acquire permanent status."  (*Broyles v. State Personnel Bd.* (1941) 42 Cal.App.2d 303, 307.)

Although probationers enjoy less protection than permanent civil servants, they are "entitled to have the statutory procedure for dismissal strictly followed."  (*Wiles v. State Personnel Bd.*, *supra*, 19 Cal.2d at p. 351.)  "Any probationer may be rejected by the appointing power during the probationary period for reasons relating to the probationer's qualifications, the good of the service, or failure to demonstrate merit, efficiency, fitness, and moral responsibility," but not for unlawful reasons.  (§ 19173, subd. (a).)  The appointing authority must serve the probationer with written notice that includes "the reasons for the rejection."  (§ 19173, subd. (b); see *Bell v. City of Torrance* (1990) 226 Cal.App.3d 189, 196-197 ["[T]he notice of rejection served within the probationary period must state specific reasons for the rejection."].)

"It is not sufficient for the appointing power simply to give its conclusions, unsupported by facts."  (*Dona v. State Personnel Bd.* (1951) 103 Cal.App.2d 49, 50.)  The rejection notice must contain "sufficient factual specificity" to provide the probationer with the opportunity to mount a focused challenge to those reasons, and to ensure the board can assess whether substantial evidence supports them.  (*In re Wendylin Donald* (2002) SPB Dec. No. 02-10, at p. 13 [2002 WL 32076962, at p. *7]; see § 19582.5 [The board "may designate certain of its decisions as precedents."].)

"'[J]ustification for the rejection of a probationary employee, lies not in the appointing power's conclusion . . . that the action is for "the good of the service and failure to demonstrate merit and fitness" or that "the conduct and actions" were

unbecoming to such an employee. Rather the justification therefor lies *in the factual reasons which support or justify such conclusion* by said appointing power that the rejection of the employee would be for the good of the service.'" (*Lincoln Unified School Dist. v. Superior Court* (2020) 45 Cal.App.5th 1079, 1092-1093, quoting *Bryant v. State Personnel Board* (1950) 96 Cal.App.2d 423, 426.)

The probationer may request in writing that the board investigate his or her rejection. (Gov. Code, § 19175.) After an investigation, the board may, with or without conducting a hearing, affirm the rejection, modify the action of the appointing power, or restore the probationer's name to the employment list for certification to any position within his or her class. (*Id.*, § 19175, subds. (a)-(c).) The board may restore the probationer to his or her position only if it finds, after a hearing, "that there is no substantial evidence to support the reason or reasons for rejection, or that the rejection was made in fraud or bad faith." (*Id.*, § 19175, subd. (d); see *id.*, § 19180.) At the hearing, the appointing authority does not have the burden of proving it did not act with bad faith or that its reasons for the rejection are true. Instead, the probationer bears the burden of proof and must overcome a rebuttable presumption that the rejection was free from fraud and bad faith and that the reasons given for the rejection are true. (*Id.*, § 19175, subd. (d); see Evid. Code, §§ 500, 605-606.)

Judicial review of a final administrative decision by the board "shall extend to the questions whether the respondent [board] has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent [board] has not proceeded

23

in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).)

B.     *Standards of Review.*

On appeal from a judgment of the superior court denying a petition for writ of administrative mandamus, we "independently determine[] whether substantial evidence supports *the* [*Board's*] *findings*, not the trial court's conclusions." (*Furtado v. State Personnel Bd.* (2013) 212 Cal.App.4th 729, 742.) """"The State Personnel Board is an agency with adjudicatory powers created by the California Constitution.' [Citation.] As such [the board] acts much as a trial court would in an ordinary judicial proceeding. Thus, [the board] makes factual findings and exercises discretion on matters within its jurisdiction. On review the decisions of [the board] are entitled to judicial deference.""" (*Fisher v. State Personnel Bd.* (2018) 25 Cal.App.5th 1, 13-14; see Cal. Const., art. VII, §§ 2-3.) "We do not substitute our own judgment if the board's decision ""is one which could have been made by reasonable people . . . .""" (*Camarena v. State Personnel Bd.* (1997) 54 Cal.App.4th 698, 701.)

"'Substantial evidence' is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. [Citation.] Such evidence must be reasonable, credible, and of solid value." (*California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 584-585.) In applying the substantial evidence test, "'[w]e do not reweigh the evidence; we indulge all presumptions and resolve all conflicts in favor of [the board's] decision. Its findings come before us 'with a strong presumption as to their

24

correctness and regularity.'" (*Palmieri v. State Personnel Bd.* (2018) 28 Cal.App.5th 845, 851.)

"We review questions of law under the independent standard of review. [Citation.] 'We respect but do not necessarily defer to [the board's] interpretations of the governing statutes. [Citation.] The judiciary takes ultimate responsibility for the construction of statutes, although according great weight and respect to the administrative construction such as is appropriate under the circumstances.'" (*Fisher v. State Personnel Bd.*, *supra*, 25 Cal.App.5th at p. 14.)

C.    *The Board Properly Concluded a Rejected Probationer Cannot Be Restored to His or Her Position If It Concludes One or More of the Reasons Given for the Rejection Is Supported by Substantial Evidence.*

Carrasco contends the board erred as a matter of law when it ruled his rejection should be upheld because two out of the six reasons given for his rejection were supported by substantial evidence. In this context, he makes three arguments: (1) the six reasons given for his rejection were an integrated whole, and the rejection cannot stand once four of the reasons were knocked out; (2) the board improperly ignored the superior court's remand order and reframed the question posed to it in such a manner that its order should be subject to heightened scrutiny; and (3) the plain language of section 19175, subdivision (d), dictated that the board restore him to his position once two-thirds of the reasons given for his rejection were found to not be supported by substantial evidence. We find neither argument to be persuasive.

25

*1.     Carrasco has not demonstrated the six reasons stated for his rejection must be considered as an integrated whole.*

As he did below, Carrasco argues the combined orders of the board and the superior court "striking of four of the six allegations" set forth in the notice of rejection "dooms the rejection as a whole and requires the rejection to fail as lacking substantial evidence under Government Code section 19175." He claims the six reasons stated in the rejection notice were "an integrated whole." Put a different way, he contends the department "relied on six combined, interlocking allegations for rejecting [him]." But, neither below nor in his briefs on appeal does Carrasco explain *how* or *why* the six reasons were necessarily interdependent and could not stand alone.

Mirroring section 19173, subdivision (a), the notice served on Carrasco stated he was being rejected "for reasons relating to [his] qualifications, the good of the service, and failure to demonstrate merit, efficiency, fitness and moral responsibility." The six reasons provided in the notice each concerned different types of alleged actions and/or omissions that disqualified Carrasco from his position as a special agent, and they took place on different dates throughout his probationary period. Nothing on the face of the notice and nothing in the administrative record indicates the department believed the rejection was justified *only* if the six reasons were considered together. Merely repeating the claim that the six reasons are interlocked and cannot survive independently does not make it so.

*2.     The board did not ignore or improperly reframe one of the questions posed to it in the superior court's remand order.*

Next, Carrasco once more argues the board ignored the superior court's remand order and failed to properly consider the first question posed to it.  He contends the board "wrongly framed the question as whether the two remaining allegations, standing alone, constituted grounds for rejecting Carrasco."  And, by ignoring the court's directive and "transform[ing] the original rationale set forth in the rejection notice," Carrasco argues the board wrongly and impermissibly altered the allegations during the appeal process.

In its remand order, the superior court directed the board to decide, inter alia, whether, "with four of the six reasons supporting Carrasco's probation lacking substantial evidence, Carrasco should be restored to his position pursuant to Government Code section 19175 . . . ."  The ALJ's proposed order, that the board adopted, reproduced that language almost verbatim in the statement of issues to be decided.  In the analysis section of the decision, however, the board phrased the issue differently, stating:  "The first question posed by the superior court's March 3, 2017 Order is whether these two proven allegations [reasons 2 and 4], standing alone, support [Carrasco's] rejection during probation; they do."

True, the board reframed or rephrased the issue.  Whereas the superior court directed the board to address whether Carrasco should be *restored* to his position because four of the reasons for the rejection had been found lacking, the board addressed whether *the rejection could stand* based solely on the remaining two reasons.  But, the two ways of framing or phrasing the issue were consistent and complementary.  The board merely

27

teased out of the court's language what was implicit: for the board to decide it could *not* restore Carrasco to his position *despite* four reasons for the rejection having been knocked out, it would have had to conclude the remaining two reasons were themselves legally sufficient to support the rejection. In that sense, the two ways of framing the issue were merely opposite sides of the same coin.

           3.       *Section 19175 contemplates that a single substantiated reason for rejection of a probationer precludes reinstatement by the board.*

Finally, we are unpersuaded by Carrasco's assertion that section 19175, subdivision (d), mandates that rejection of a probationary employee must be considered an all-or-nothing proposition and, if some or even a majority of the reasons that were given for the rejection are later found to not be supported by substantial evidence, the rejection as a whole cannot stand as a matter of law. He argues the issue presented here is a question of first impression and that interpretation of section 19175 is a legal question we must review de novo. The board agrees with Carrasco that questions of law are reviewed de novo but argues the board's interpretation of section 19175 is entitled to great weight and should be reversed only upon a showing a clear error. For its part, the department argues resolution of the issue turns on the facts of the case, not on interpretation of a statute that is clear on its face and, therefore, the appropriate standard of review is the deferential substantial evidence test.

We agree with Carrasco that whether section 19175 precludes reinstatement of a rejected probationer when less than all the reasons given for the rejection are found to be supported by substantial evidence, is a question of statutory interpretation and is distinct

28

from the question of whether the individual reasons themselves are supported by substantial evidence. The department's assertion that section 19175 is clear on its face and requires no interpretation begs the question: we cannot determine whether the statute is clear on its face and requires no further interpretation without engaging in the act of statutory interpretation the department says we should avoid. (See *Robinson v. Shell Oil Co.* (1997) 519 U.S. 337, 340 [determining whether the meaning of a statute is plain and unambiguous on its face is the "first step" of statutory interpretation]; *Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332 [same].) And, to repeat, although the board's interpretation of the civil service statutes is entitled to respect and great weight, ultimately the question of statutory interpretation is the courts' responsibility. (*Fisher v. State Personnel Bd.*, *supra*, 25 Cal.App.5th at p. 14; *Department of Corrections & Rehabilitation v. State Personnel Bd.* (2016) 247 Cal.App.4th 700, 708.)

Interpretation of a statute is a question of law we review de novo. (*John v. Superior Court* (2016) 63 Cal.4th 91, 95.) "'The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citation.] "We begin by examining the statutory language, giving the words their usual and ordinary meaning. [Citation.] If there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citation.] If, however, the statutory terms are ambiguous, then we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such circumstances, we "'select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather

29

than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.""""" (*City of Desert Hot Springs v. Valenti* (2019) 43 Cal.App.5th 788, 793.)

As originally adopted, section 19175 provided for restoration of a probationer if, after an "investigation of the reasons for rejection," the board concluded the hiring authority did not comply with section 19173. (Former § 19175, subd. (b), added by Stats. 1945, ch. 123, § 1, p. 559; see *Boutwell v. State Bd. of Equalization*, *supra*, 94 Cal.App.2d at p. 947.) But, the statute was amended four years later to provide for reinstatement only if the board concluded the "reason *or* reasons" for the rejection were not supported by substantial evidence or that the appointing authority acted fraudulently or with bad faith. (Former § 19175, subd. (c), as amended by Stats. 1949, ch. 575, § 2, p. 1072, italics added; see *Boutwell*, at p. 950.) The addition of "reason" singular to "reasons" plural for the rejection (§ 19175, subd. (d); Stats. 2011, ch. 60, § 2) is strong evidence the Legislature intended that a single substantiated reason will legally suffice to uphold the rejection (absent fraud or bad faith), regardless of how many reasons were given in the notice or how many are found to not be supported by substantial evidence. Nothing in the plain language of the statute supports Carrasco's contrary assertion.

The courts have phrased the requirements of section 19175 in a manner which supports our conclusion. In *Anderson v. State Personnel Bd.* (1980) 103 Cal.App.3d 242, the court noted: "A rejected probationary employee, after a hearing before the board, may be reinstated only on a showing that there was no substantial evidence to support *the rejection*; the rejection is presumed to be free from fraud and bad faith." (*Id*. at p. 249,

30

italics added, citing former § 19175, subd. (c); Stats 1959, ch. 1999, § 1, p. 4642.) And, citing *Anderson*, the appellate court in *Lee v. Board of Civil Service Comrs.* (1990) 221 Cal.App.3d 103 used the same phraseology: "A rejected probationary employee may be reinstated only on a showing that there was no substantial evidence to support *the rejection*." (*Id*. at p. 108, italics added, citing *Anderson*, at p. 249.) Tellingly, those courts interpreted section 19175 to focus on the ultimate question of whether the *rejection* is supported by substantial evidence, and not on whether each reason or even a majority of reasons for the rejection (when more than one was given) is supported by substantial evidence.[4]

In its brief, the board says it has similarly interpreted section 19175 in a precedential decision to prevent reinstatement of a probationer if at least one of the stated reasons for the rejection is supported by substantial evidence and the supporting facts demonstrate a sufficiently serious reason to disqualify the probationer. (See *In re David*

_____

[4] When the intent of the Legislature is clear on the face of a statute, we usually eschew reviewing legislative history. (*People ex rel. Alzayat v. Hebb* (2017) 18 Cal.App.5th 801, 817.) Although we find no ambiguity in section 19175 on the precise question presented here, we do note that a document in the Governor's chaptered bill file lends some support to the reading given to section 19175 by the courts in *Anderson v. State Personnel Bd.*, *supra*, 103 Cal.App.3d 242 and *Lee v. Board of Civil Service Comrs.*, *supra*, 221 Cal.App.3d 103. In a report to Governor Earl Warren, the Director of Finance explained, inter alia, that the bill to amend section 19175 would "provide that a rejected probationer shall be restored to his position only if the State Personnel Board determines after hearing that there is no substantial evidence to support *the rejection* . . . ." (Director of Finance James S. Dean, Rep. on Assembly Bill No. 2045 (1949-1950 Reg. Sess.) prepared for Governor Warren (June 3, 1949) p. 1, Governor's chaptered bill files, ch. 575, italics added.)

On our own motion, we have taken judicial notice of this document, and it is available in this court's case file. (Evid. Code, §§ 452, 459; *PGA West Residential Assn.*, *Inc. v. Hulven Internat.*, *Inc.* (2017) 14 Cal.App.5th 156, 174, fn. 11.)

*Rodriguez* (1994) SPB Dec. No. 94-29, pp. 15, 17 [1994 WL 16006537, at p. *7]

[concluding one of two reasons given for the probationer's rejection—falsification of

timesheets—was "alone sufficient" to support his rejection].) Carrasco responds the

decision in *Rodriguez* is not binding on us. For the reasons already stated, *ante*, we

agree. He also argues the board did not, in fact, interpret section 19175 in *Rodriguez*, the

board is now taking language from *Rodriguez* out of its proper context and, in any event,

that language is unnecessary dictum. We need not resolve those questions here. But, to

the extent the precedential decision in *Rodriguez* does reflect the board's reasoned

interpretation of section 19175 as preventing reinstatement of a probationer if at least one

of the reasons given for the rejection is supported by substantial evidence, we find it to be

persuasive authority because it is consistent with the plain language of section 19175 and

the interpretation given to it by other courts.

Carrasco argues the interpretation of section 19175, subdivision (d), we adopt here

ignores "the disjunctive meaning of 'reason or reasons.'" True, the ordinary and popular

meaning given to the word "or" in a statute is disjunctive, signifying it marks out "'an

alternative such as "either this or that."'" (*In re Jesusa V.* (2004) 32 Cal.4th 588, 622-

623.) But, that rule of construction applies when a statute uses the word "or" to

differentiate separate, distinct categories. (See *White v. County of Sacramento* (1982)

31 Cal.3d 676, 680; *Anderson v. Davidson* (2019) 32 Cal.App.5th 136, 146.)

We are not persuaded by Carrasco's assertion that section 19175, subdivision (d),

"sets up two categories of rejections—those based on a single reason and those based on

multiple reasons." A "reason" for rejecting a probationer remains a "reason" regardless

of how many are set forth in the notice. (§ 19173; see *John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438, 459 (conc. & dis. opn. of Eagleson, J.) ["'Rose is a rose is a rose is a rose.' (Gertrude Stein, Sacred Emily (1913).)"].) It is not transformed into something else, such that it falls into a different *category*, merely because more than one has been provided. (Cf. § 13 ["The singular number includes the plural, and the plural the singular."].)

Finally, we agree with the board that Carrasco's suggested interpretation of Government Code section 19175, subdivision (d), would result in absurd consequences. As noted, *ante*, the California Constitution provides that "permanent appointment and promotion" to the civil service shall be "based on merit." (Cal. Const., art VII, § 1, subd. (b); see *California State Personnel Bd. v. California State Employees Assn.*, *Local 1000*, *SEIU*, *AFL-CIO*, *supra*, 36 Cal.4th at p. 764; see also Gov. Code, §§ 18502, 19800.) If the board finds that even one of the reasons given for rejecting a probationer is supported by substantial evidence, by definition it has found the appointing authority was justified in concluding the probationer lacked merit or was otherwise unsuited to the position and should not be permanently appointed. (Gov. Code, §§ 19173, subd. (a), 19175, subd. (d).) Under Carrasco's interpretation, however, the board would nonetheless be required to reinstate the probationer notwithstanding his or her proven unfitness or unsuitability. Because that interpretation would potentially lead to absurd consequences, we must reject it. (*City of Desert Hot Springs v. Valenti*, *supra*, 43 Cal.App.5th at p. 793.)

For all these reasons, we hold the board properly concluded Carrasco was not entitled to reinstatement as a matter of law notwithstanding that four of the six reasons given for his rejection had been found to not be supported by substantial evidence.

D.    *The Administrative Record Supports the Board's Findings That Reasons 2 and 4 for Carrasco's Rejection Are Supported by Substantial Evidence.*

Carrasco acknowledges he faces the "'daunting task'" of demonstrating the board's findings are not supported by substantial evidence.  (See *Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 678 ["[Appellant] raising a claim of insufficiency of the evidence assumes a 'daunting burden.'"], quoting *In re Marriage of Higinbotham* (1988) 203 Cal.App.3d 322, 328-329.)  Nonetheless, he argues the administrative record does not support the two remaining reasons for his rejection.  We conclude otherwise.

1.    *Carrasco did not meet his burden of proving he did not resist his instructors' efforts to provide corrective instruction during a training exercise (reason 2).*

With respect to reason 2, Carrasco argues the testimony of Marks and Lee, as well as the video of the training exercise, establish he "followed instructions, was not discourteous, did not make excuses, and was not argumentative."  According to Carrasco, the video is the "most persuasive evidence" because of what it *does not depict*:  him not following instructions, him being discourteous or argumentative, and him failing to take responsibility and refusing to accept criticism.  But, as the superior court noted, the video only depicts the room-entry exercise during which Carrasco was alleged to have failed to personally address a threat behind the door.  That is *not* what the notice of rejection stated

34

was a reason for his rejection. Instead, reason 2 focused on what Carrasco did and failed to do *after* the training scenario. The notice set forth some details of the tactical error that Marks and Mory observed, as factual background, but it was patently not the focus of reason 2. Therefore, we need not address further the parties' arguments about whether the evidence shows Carrasco did or did not make a tactical error during the training exercise.

As noted, Marks testified that, during a group debriefing (which, by definition, would have occurred *after* the room-entry exercise and would not have been captured in the video of the exercise), Carrasco was "resistant" to correction by his instructors, he "refused to listen," and he "talked over" the instructors and tried to explain to them why he thought he had done nothing wrong. And, when Mory pulled him aside for a one-on-one conversation, Carrasco did not seem to be ready to move on. When asked if Carrasco had been discourteous, Marks testified Carrasco was "somewhat resistant to listening" to his instructors and seemed to have an attitude that Marks described as, "I've been there, done that." He was not rude and did not use foul language. However, because Carrasco would not listen and continued to defend his actions during the training exercise, Marks testified "we couldn't get to a corrective discussion." Marks explained, "You can't correct something if someone doesn't believe he did something incorrect."

In addition, in his report that was introduced into evidence without objection, Marks wrote that he had told Carrasco "he would need to follow training directives without continually making excuses." But, "[d]uring *other* scenarios"—meaning training

scenarios other than the room-entry exercise captured in the video—"Carrasco made *additional excuses* for not following the training procedures." (Italics added.)

The evidence amply supports the board's factual findings that Carrasco "denied" that he made a tactical error during the room-entry exercise, he insisted he did nothing wrong and, although he had been reminded to follow the training directives without making excuses, he continued to deny wrongdoing and was not receptive to the training. One of the specific functions of a special agent is "to accept constructive criticism, feedback and use supervisory direction positively." As the board concluded, Carrasco's resistance to being trained on matters relating to his own safety and the safety of other special agents, and his unwillingness to even listen to constructive criticism, "is not a trivial event" and was a legitimate basis for the department to conclude he was unsuited to the position of special agent.

Carrasco argues Lee's testimony demonstrates Carrasco was not belligerent or discourteous, and he did not talk over his instructors. True, the notice of rejection stated Carrasco was "discourteous," but the board made no finding that he had been rude, discourteous, or belligerent. Because our review is limited to whether the *board's findings* are supported by substantial evidence (*Furtado v. State Personnel Bd.*, *supra*, 212 Cal.App.4th at p. 742), whether the record shows he acted rudely is beside the point. In addition, Lee testified he was not a member of the tactical team taking part in the exercises but was only one of the role players. He spent most of his time inside the house, where the exercises took place while preparing for the next exercise, and he was not around "all the times" Marks and Mory spoke to Carrasco. In short, Lee's testimony

36

in no way refutes Marks' testimony about how Carrasco reacted to the attempts to provide constructive criticism.

Last, relying on Moreno's testimony, Carrasco argues the record proves he corrected whatever deficiencies he had displayed during the training exercise. As already noted, whether Carrasco made a tactical error is not the issue, so whether he corrected that deficiency is not one either. More importantly, Moreno's testimony simply does not support Carrasco's assertion. Carrasco received training from Moreno shortly after he began his assignment as a special agent in August 2013. Moreno testified that in January 2014 Carrasco had been given a "write-up," so Moreno was tasked with providing additional field training. When asked his opinion whether, at the end of that field training, he believed "Carrasco was capable of performing his job on his own," Moreno answered, "On some cases, yes. On some other ones, he needed more guidance." Moreno expressly testified he would not have necessarily known about every case Carrasco handled or was involved in but, for the cases he was aware of, Moreno testified Carrasco successfully completed the field training. He was not asked and did not testify that he was aware of the Simunition® training incident or of Marks' report, so Moreno's testimony hardly undermines the substantial evidence in the record that supports the board's finding.

In sum, Carrasco has not shown that the evidence introduced during the hearing dictated a finding by the board in his favor that reason 2 was not supported by substantial evidence.

*2.    Carrasco did not meet his burden of proving he did not submit an untimely and incomplete arrest report (reason 4).*

Next, Carrasco argues the administrative record does not support the board's findings that he failed to submit an arrest report within six business days of the arrest and that the report was deficient.  Once again, we conclude otherwise.

Santos testified the six-day rule for when reports had to be submitted was not in writing and it was not to be found in the department's operations manual.  Instead, it was an "office" or "local expectation" of when reports had to be submitted, and he had transmitted that expectation to subordinate agents under his supervision during "minute meetings."  Carrasco acknowledged that he became aware of that expectation during a meeting that took place sometime in 2013, and Santos testified he had expressly instructed Carrasco to submit a report about the March 26, 2014 arrest within six days.  Santos also testified that, on the sixth day after the arrest, Carrasco said he needed "follow-up documents" and did not submit the report for revisions until April 9.  And, Carrasco acknowledged he submitted his report more than six days after the arrest, meaning it was late.

There is simply no dispute that Santos had informed his subordinates, including Carrasco, that he expected reports to be submitted within six days.  And, there is no dispute Santos had directed Carrasco to submit the arrest report in question within six days, yet Carrasco failed to comply with that directive.  In short, the evidence submitted during the evidentiary hearing supports the board's findings that Santos had "directed that [special agents] under his supervision complete and submit an arrest report within six

38

busines days after an arrest," Carrasco "became aware of this directive in 2013," he was the lead investigator on the March 26, 2014 arrest, he "was responsible for preparing the arrest report," and he "submitted an arrest report to . . . Santos . . . four days late."

Santos also testified that, because the arrest in question resulted in the seizure of cash, he would have expected Carrasco's report to include certain attachments, such as an asset forfeiture form and consent to search form. The draft report Santos received on April 10 lacked those attachments. Carrasco did not submit those forms until later, after continued prodding from Santos. And, Carrasco acknowledged the report he submitted on April 9 for rewriting and correction was incomplete. That evidence supports the board's finding that Carrasco's arrest report "contained numerous omissions."

Carrasco argues the department had no written "policy or standard operating procedure" that governed when arrest reports had to be submitted, so he cannot be faulted for not timely submitting the report. But, he cites no authority for the implicit proposition that failure to timely submit a report is a legitimate reason for rejecting a probationer *only* if the appointing authority had a written policy on the subject, and we have found none. To repeat, the evidence amply demonstrates Carrasco was aware of the directive by his supervising officer to submit arrest reports within six days, but he failed to comply with it.

Next, Carrasco argues he cannot be faulted for submitting an incomplete report because no evidence was introduced that he "knew what required elements [the department] needed in the arrest report since he had not received the training on report writing." But, other than cite to the fact he did not receive classroom training on report

39

writing, because the OCS academy had been cancelled, Carrasco directs our attention to no affirmative evidence in the administrative record demonstrating he had no knowledge of what needed to be included in the report. For example, he did not himself testify that he received no training whatsoever on report writing. Moreover, the record directly contradicts his assertion that no evidence was admitted that his "supervisor (or anyone else) provided guidance . . . on how to prepare the report." Moreno specifically testified that part of the field training he provided to Carrasco included "showing him what paperwork needed to be done for different arrests, *different report writing*, different threat assessments, [and] different escapes." (Italics added.)

Thus, we conclude Carrasco has not demonstrated the evidence dictated that the board find in his favor that reason 4 was not supported by substantial evidence.

*E.      The Administrative Record Supports the Board's Findings That the Department Did Not Act in Bad Faith When It Rejected Carrasco.*

Carrasco also argues the board erred because the administrative record demonstrates the department acted in bad faith when it rejected him. Again, we are unpersuaded.

*1.      Additional facts.*

In a "Report of Performance for Probationary Employee" signed December 19, 2013, Santos rated Carrasco's performance during his first four months as a special agent in three areas as: "Improvement Needed" (skill, knowledge, and learning ability); "Standard" in three areas (work habits, attitude, and communication); "Outstanding" in one area (relationships with people); and an overall rating of "Standard." Santos

acknowledged Carrasco was still a new special agent, and that the transition from parole agent might be difficult and stressful. But, he expected Carrasco to be more aggressive in learning the job and to take on "self-generated investigations" so Santos could evaluate Carrasco's report writing skills. Santos wrote he believed Carrasco had "the ability to become a great investigator and prominent member of the law enforcement community."

In a "Letter of Performance & Training Expectations" dated January 20, 2014, however, Santos noted several deficiencies in Carrasco's performance. The previous October, Santos had discussed with Carrasco "ways to enhance [his] performance and maintain efficiency in performing the duties of [his] job." The two had discussed "training, development needs, and [the] need to follow instructions from experienced Special Agents." The purpose of the discussion had been "to set goals for [Carrasco] to perform [his] job duties successfully."

However, since that conversation, Carrasco's performance had been lacking in several areas. First, although one of the topics during the October 2013 conversation had been the expectation that Carrasco would "cultivate and investigate a validated gang member" and "open interest in an escape cold case," Carrasco had not yet "produced any complex investigations that would demonstrate [his] ability to investigate." Second, Carrasco had attended 10 operational briefings and knew of their importance. But, during an operational briefing conducted in December 2013, Carrasco received a personal telephone call and left the briefing, which "resulted in the disruption of the briefing, caus[ed] a breakdown in communication, and demonstrate[ed] [his] lack of interest with the case." Third, despite receiving training on surveillance techniques and escape

41

procedures, Carrasco paid insufficient attention during an investigation of an escapee. Last, Carrasco failed to follow established protocol during the same investigation.

The letter listed several expectations Carrasco was to meet, and Santos wrote that Carrasco would be assigned to an experienced special agent for 45 days of training, after which he would be evaluated again. Carrasco acknowledged receipt of the letter, wrote that it included untrue and inaccurate statements, and signed the letter under protest.

As already noted, Moreno provided Carrasco with additional field training for roughly 45 days, after which he concluded Carrasco "was capable of performing his job on his own" in "some cases" but, in others, "he needed more guidance." Similarly, when asked if Carrasco "successfully complet[ed]" the 45-day training, Santos testified, "Yes, he completed the time frame, but there were still some issues that needed to be addressed." Santos was "sure" he had discussed with Carrasco the areas where additional improvement was needed.

Santos authored an "Interim Performance Report" dated March 1, 2014, but he did not sign or officially submit it because the department was "going forward" with Carrasco's rejection. The draft report indicated that, during the 45-day training period, Carrasco had demonstrated the ability to "[e]ffectively put together an investigative file," and he had shown improvement with "gang validations." However, the report indicated Carrasco had still not demonstrated adequate investigative skills, he had willfully disobeyed Santos' directive to conduct a "cold case" investigation, he had neglected his duty during an operation to apprehend an escapee, and he had failed to accept criticism during the Simunition® training. Santos wrote that Carrasco had "not successfully

42

demonstrated the ability to perform the functions of a Special Agent," and "[t]here must be demonstrable improvements or you will not pass your probation." Although the report was not officially submitted, Carrasco acknowledged receiving it on March 21, 2014, he disputed the truth and accuracy of its contents, and he signed it under protest.

Notwithstanding that the decision to reject Carrasco had been effectively made in March 2014, he remained in his position until he was served with the notice of rejection on June 23, 2014.

### 2. *Applicable law.*

Even if the board finds the reason or reasons given by the appointing power for rejecting a probationer are supported by substantial evidence, it must still reinstate the probationer if it finds he or she has rebutted the presumption that the rejection was not made in bad faith. (§ 19175, subd. (d).) The parties agree the definition given to "bad faith" by the appellate court in *Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627 (*Kuhn*) is the correct legal standard.

Citing *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683-684, the court in *Kuhn* observed that, "[v]iewing the terms and conditions of employment as creating a species of contract between employer and employee, there is implied in this relationship (as in all contracts) a covenant of good faith and fair dealing; the obligation imposed by this covenant is measured by the provisions of the particular agreement at issue." (*Kuhn*, *supra*, 22 Cal.App.4th at p. 1637.) As *Kuhn* explained, the implied covenant "is an implied promise that neither party will take any action extraneous to the defined relationship between them that would frustrate the other from enjoying benefits under the

43

agreement to which the other is entitled. [Citations.] Thus, under its obligation to act in good faith DGS could not take any action with the intention that the procedural or substantive entitlements of its probationary employees be illegitimately thwarted."[5] (*Id*. at pp. 1637-1638.) In addition, the court noted that, "[c]onceivably, bad faith might be demonstrated where an employer has a range of permissible actions if the choice were driven by animus against the employee's enjoyment of a benefit." (*Id*. at p. 1640.)

In *In re Joe Nava* (1995) SPB Dec. No. 95-05 (*Nava*), a probationer employed by the Employment Development Department (EDD) received a performance report in which he was rated "standard" or "outstanding" in all categories, and "standard" overall. The report urged the probationer to continue his hard work and told him he was outperforming other employees "at the same stage of training." The probationer and his supervisor signed the report and it became part of the probationer's personnel file. (*Id*. at pp. 3-4 [1995 WL 17007442, at p. * 2].) Three months later, the probationer received a similarly positive performance report. The report stated there had been some concern about the probationer's attendance, but it noted the probationer "had taken constructive

---

[5] Although the parties agree we should apply the test for "bad faith" from *Kuhn*, *supra*, 22 Cal.App.4th 1627, we note the analysis in that decision appears to be in tension with the consistent holding by the California Supreme Court and this state's appellate courts that public employees hold their employment pursuant to statute or similar enactment, *not by contract*, and that, at least with respect to the duration and terms of employment (as opposed to contractual matters such as entitlement to wages and pension benefits), a public employee cannot sue for breach of the implied covenant of good faith and fair dealing. (See, e.g., *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 23-24; *Sheppard v. North Orange County Regional Occupational Program* (2010) 191 Cal.App.4th 289, 311-313.) But, we need not decide in this appeal whether we agree with *Kuhn*'s interpretation of section 19175, subdivision (d), is correct.

44

steps" to address those concerns and "[n]othing in the report indicated any major dissatisfaction concerns with the appellant's work performance." The probationer signed and returned the report. He assumed his supervisor had also signed it and "was never told otherwise." (*Id*. at pp. 4-5 [1995 WL 17007442, at p. * 2].)

Unbeknownst to the probationer, a manager rejected the second performance report and directed the supervisor to prepare a revised report that now rated the probationer as "unacceptable" in three categories, "standard" in two and "outstanding" in one category, and "unacceptable" overall. In addition, the revised report now indicated the probationer's work performance and productivity were unacceptable, and, although it acknowledged some improvement with attendance, it stated the probationer's absences resulted in a rating of "unacceptable" for the category of "work habits." (*Nava*, *supra*, SPB Dec. No. 95-05, at pp. 5-6 [1995 WL 17007442, at pp. *2-*3].) The probationer did not learn of the revised report until he returned from a week-long training, and, until he received a notice of rejection three months later, he was not placed on the schedule to report to work. (*Id*. at pp. 6-8 [1995 WL 17007442, at p. *3].)

In its decision reinstating the probationer, the board indicated he bore "a heavy burden" of overcoming the presumption under section 19175, subdivision (d), that his rejection was free from bad faith. (*Nava*, *supra*, SPB Dec. No. 95-05, at p. 10 [1995 WL 17007442, at p. *5].) Applying the test for "bad faith" from *Kuhn*, *supra*, 22 Cal.App.4th 1627, the board found: (1) the EDD had "misled" the probationer "about its satisfaction with his work performance"; (2) "by refraining from issuing the revised second Report of Performance until his final day at work, [it] gave him no opportunity to address the newly

45

leveled criticisms"; and (3) it "continued to mislead" the probationer for weeks about his employment status. (*Id*. at pp. 12-13 [1995 WL 17007442, at p. *6].) The EDD "changed its position" about the probationer's work performance and kept him in the dark about it "until it was too late for [him] to address the newly raised concerns." As the board put it, the EDD's "shifting evaluation" of the probationer's performance "lulled [him] into a false sense of security . . . ." (*Id*. at p. 14 [1995 WL 17007442, at pp. *6-*7].) Therefore, the board concluded the record showed the EDD intended to "'illegitimately thwart'" the probationer's "entitlement to a fair opportunity to demonstrate his ability to pass probation." (*Id*. at pp. 13, 18 [1995 WL 17007442, at pp. *6, *8].)

### 3. *Analysis.*

The facts introduced during the evidentiary hearing do not show the department acted in bad faith or with animus when it rejected Carrasco. As the board found in its ruling, the facts of this case are distinguishable from *Nava* because the department "did not mislead [Carrasco] by giving him favorable performance evaluations and later determining that the same conduct was unacceptable." Carrasco's December 2013 performance evaluation rated him as "standard" overall, but Santos noted areas where he expected to see improvement. The next month, though, Santos wrote a very unfavorable letter of performance that outlined Carrasco's deficiencies and failure to act toward the goals he and Santos had discussed the previous October. Santos assigned Moreno to provide Carrasco with additional field training for 45-days. Although Carrasco demonstrated the ability to perform the duties of a special agent in "some" areas, he had

46

been informed he still needed to address some issues. And, in the March 2014 "Interim Performance Report," Carrasco was informed of serious deficiencies and that he was at risk of not successfully completing his probation. In other words, unlike in *Nava*, the department did not lull Carrasco into the false sense of security by consistently telling him he was doing very well in his job, then pull the rug out from under him and tell him his performance was unacceptable. (*Nava*, *supra*, SPB Dec. No. 95-05, at p. 14 [1995 WL 17007442, at pp. *6-*7].)

Carrasco argues the circumstances of how reasons 2 and 4 came to be included in the notice of rejection is evidence the department acted in bad faith.

First, Carrasco argues the department "failed to timely provide [him] with notice, additional training, and a reasonable chance to correct his deficiencies over the simunition training."[6] According to Carrasco, the first notice he received about issues related to the training was two months later when he received the interim performance report. However, by that time the department had already decided to reject him and it acted duplicitously by instructing Marks to write a report about the training "after the fact

---

[6] Carrasco also argues the department acted in bad faith when it failed to comply with sections of the State of California Supervisor's Handbook: A Guide to Employee Conduct and Discipline (2004), adopted by the former Department of Personnel Administration. But he cites no authority to support that proposition. To the contrary, the *regulation* governing performance appraisals of probationers expressly states its "provisions shall be construed as directory." (Cal. Code Regs., tit. 2, § 599.795.) And, in *Nava*, the board ruled failure to comply with that regulation "does not necessarily constitute bad faith or provide justification for restoring a rejected probationer." (*Nava*, *supra*, SPB Dec. No. 95-05, at pp. 13-14 [1995 WL 17007442, at p. *6].)

supporting its conclusion." These acts, according to Carrasco, demonstrated the department acted with an "'improper motive'" and with "'animus'" toward him.

To repeat, the notice of rejection did not rely on Carrasco's tactical "deficiencies" during the room-entry exercise as a reason for the rejection, so even assuming the department provided him with no additional tactical training to correct those "deficiencies," it is not evidence of bad faith. And, to the extent Carrasco suggests he was never placed on notice or given an opportunity to correct the real deficiency at the heart of reason 2, the record suggests otherwise. In October 2013, Santos expressly told Carrasco he "need[ed] to follow instructions from experienced Special Agents." Yet, as demonstrated, *post*, Carrasco did not heed that directive three months later during the training exercise.

Nor do we agree with Carrasco's suggestion that the record shows the department acted duplicitously when it documented his conduct during the training exercise to support his rejection. The fact Carrasco was not immediately provided with formal notice of, or disciplined for, his conduct during the Simunition® training did not preclude the department from using that misconduct as a basis for his rejection once it was decided that he did not meet the qualifications for his position. An appointing authority does not waive "its right to reject an employee during probation for misconduct or poor performance because it failed to reject the employee at or about the time an incident occurred. While a department should certainly keep an employee apprised of how the employee is performing during the probationary period, a department may wait until the end of the probationary period to actually effect the rejection of the employee for conduct

occurring at any time during the probationary period." (*In re David Rodriguez*, *supra*, SPB Dec. No. 94-29, at pp. 12-13 [1994 WL 16006537, at pp. *5].)

Second, Carrasco argues the department acted in bad faith by "pil[ing]-on" the allegation that he failed to timely submit a complete arrest report. For the reasons just discussed, we reject his suggestion that the department could not rely on performance deficiencies that occurred after the decision to pursue his rejection had already been made. Carrasco also repeats his assertions that no evidence was introduced at the hearing that he received proper training on report writing, and that he could not be expected to comply with a "nebulous" and unwritten rule about when reports were due. But, as discussed, *ante*, Carrasco bore the affirmative burden of demonstrating he did not receive any training and that he was unaware of his supervisor's expectations about reports, and he failed to meet that burden.

Last, Carrasco argues the mere fact the department included reasons 2 and 4 in the notice of rejection, when the other 4 reasons lacked evidentiary support, demonstrates it acted in bad faith and with animus. He contends the department "aimed to trump up claims" against him" and "just threw spaghetti at a wall to see what would stick." But, as the board noted in its ruling, there is no evidence in the record the department knew or suspected that four of its reasons for rejecting Carrasco would not withstand scrutiny, and it added reasons 2 and 4 as insurance. Even the superior court at first concluded reason 5 was supported by substantial evidence, which belies Carrasco's implicit suggestion that all six reasons lacked any evidentiary support whatsoever.

And, because we have concluded, *ante*, that section 19175, subdivision (d), does not require reinstatement if the board finds that less than all the reasons given for the rejection are supported by substantial evidence, we must agree with the board's conclusion that "intent of bad faith cannot be determined by some quantitative standard that only measures the number of reasons ultimately found [to be] supported by substantial evidence versus the number of reasons that were not."  Given the ample evidence in the administrative record to support the board's findings that reasons 2 and 4 were supported by substantial evidence, we simply cannot conclude that Carrasco met his affirmative burden of demonstrating his rejection was the result of the department's bad faith.

## III.

## DISPOSITION

The judgment is affirmed.  The department and the board shall recover their costs on appeal.

CERTIFIED FOR PUBLICATION

McKINSTER
                                                        Acting P. J.

We concur:

MILLER
            J.

FIELDS
            J.

50